## In re UNITED PRESS INTERNATIONAL, INC., Debtor.

Bankruptcy No. 85–00257.

United States Bankruptcy Court, District of Columbia.

April 22, 1986.

Charles R. Dougherty, Hill & Barlow, Boston, Mass., for debtor.

Emil Hirsch, Washington, D.C., for Media News Corp.

## OPINION

GEORGE FRANCIS BASON, Jr., Bankruptcy Judge.

This opinion explains why this Court, having twice extended the period of the Debtor's exclusive right to file a plan, has now, by Order dated March 31, 1986, again extended the exclusivity period for filing a plan, and also extended the exclusivity period for obtaining acceptances, from March 31 to June 30, 1986. Part III of this opinion also explains why this Court is today signing an Order, *nunc pro tunc* as of April 8, 1986 (the date of the Court's oral ruling from the bench), (i) granting the Debtor's application for leave to file a plan and (ii) overruling Media News Corporation's objection to the Debtor's filing of a plan. This Opinion constitutes the Court's findings of fact and conclusions of law in support of today's Order.

Media News Corporation ("MNC") has opposed the Debtor's motion for the further extension of the exclusivity period to

June 30 and has advanced three principal arguments in support of its position.

## I. Further extension of the Debtor's exclusivity period is not barred by 11 U.S.C. § 1121(c)(3).

First, MNC has argued that the Debtor's exclusive right to file a plan has already expired automatically by operation of law because of the expiration of the 180-day period of 11 U.S.C. § 1121(c)(3).[1] Two cases support MNC's argument, *In re Trainer's, Inc.*, 17 B.R. 246 (Bankr.E.D.Pa.1982), and *In re Barker Estates, Inc.*, 14 B.R. 683 (Bankr.W.D.N.Y.1981). In both cases, the courts pointed out that the three alternatives set out in subsection 1121(c) are disjunctive. That is, the exclusivity period ends automatically if *any one* of the three conditions is met: (1) if a trustee is appointed;[2] *or* (2) if "the debtor has not filed a plan before 120 days after the ... [voluntary Chapter 11 petition was filed]";[3] *or* (3) if "the debtor has not filed a plan that has been accepted, before 180 days after the [same] date ..., by each class of claims or interests that is impaired under the plan."[4] Moreover, § 1121(d) is also in the disjunctive: "... the court may ... increase the 120-day period *or* the 180-day period ..." (Emphasis added.) The *Trainer's* court concluded (17 B.R. 247–248):

... that the language of the Code is clear: the debtors must meet *both* the 120-day and the 180-day deadlines (or obtain extensions of both of those deadlines) in order to prevent anyone else from being permitted to file plans. Furthermore, an extension of one of the deadlines does not automatically extend the other.

In *Barker*, the debtor had argued that the intent of Congress was to provide for a 60-day grace period after filing a plan within which to obtain acceptances. The court acknowledged that such a grace period "may be implied" but held that "a fixed 60-day grace period is only a possible conclusion not a necessary one." 14 B.R. at 684. The court then turned to legislative history and declared (14 B.R. at 684, 685):

The legislative history of § 1121 provides no compelling answer to the issue at hand, but it is helpful to the extent it provides a background against which the provisions of § 1121 must be read as a limitation on rather than a grant of debtor's rights.

\* \* \* \* \* \*

When compared to prior law, the effect of 11 U.S.C. § 1121 is sharply to limit a debtor's exclusive right to file a plan. Creditors with ideas of their own can only be silenced if the debtor files a plan within 120 days and secures acceptance within 180 days. Both these time periods run from the date the order for relief was granted and are set out in separate paragraphs without reference to the other. A straightforward reading of the

---

**1.** The full text of 11 U.S.C. § 1121 in its entirety is:

(a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case.

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—

(1) a trustee has been appointed under this chapter.

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

(d) On request of a party in interest made within the respective periods specified in subsection (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

**2.** 11 U.S.C. § 1121(c)(1).

**3.** 11 U.S.C. § 1121(c)(2).

**4.** 11 U.S.C. § 1121(c)(3).

statute suggests that each time limitation is independant [sic] of the other and each has its own purpose, force and effect. The debtor's theory that the time limits are necessarily connected and a 60-day grace period must be implied can be credited only if the apparent meaning of the statute is discredited. Therefore, extension of one time period should not extend the other automatically.

The court in *In re Ravenna Industries, Inc.*, 20 B.R. 886, 891 (Bankr.N.D. Ohio 1982) disagreed (in *dictum* ) with *Trainer's* and *Barker*, stating:

This Court is of the opinion that where a debtor asks for an extension of the 120-day period and an extension is granted without objection by any party in interest, then the extension automatically operates to extend the 180-day period as well. Such a conclusion follows as when a debtor has obtained an extension of the exclusive time in which to file a Plan under 11 U.S.C. § 1121(c)(2) to later hold that the Debtor has lost the exclusive right to file a Plan due to its failure to have both time periods extended by express Court order, is to deny the debtor the right obtained by virtue of the order extending the 120-day time period.

\* \* \* \* \* \*

Otherwise, the order of the Court granting the extension would be a vain act and would be misleading to all parties in the arrangement proceedings.

In addition, 5 *Collier on Bankruptcy*, ¶ 1121.03 states (at p. 1121–9):

A technical reading of section 1121 would require independent extensions of the two periods; there is no specific suggestion in the Code to the contrary. Such a reading of section 1121, however, may lead to anomalous results in those cases in which only the 120-day period is extended and especially in those cases in which that period is extended beyond 180 days. If the statute requires independent extension of both periods, then any extension of the 120-day period beyond the date of expiration of the 180-day period would have no effect due to the continued application of the 180-day period. The Code should not be construed so strictly as to nullify the effect of judicial action proper on its face. This is not to say that automatic extension of the exclusivity period for acceptance to 60 days beyond the date to which the court has extended the exclusivity period for filing can be supported by the language of the Code. A more judicious course would be to extend the acceptance period automatically only in those cases where the filing period has been extended beyond the expiration of the acceptance period and only to the date to which the filing period has been extended. On or before the time of filing its plan, the debtor would have to make a motion to extend the period for soliciting acceptances and the court would be required to determine such matter consistent with the circumstances of the case.

The arguments in *Ravenna* and *Collier's* are persuasive, to the effect that the *Trainer's* and *Barker* decisions lead to an "anomalous result," in which the debtor would be denied a right explicitly granted by a court order "for cause" and in which the court order granting the extension "would be a vain" and "misleading" act. This Court further agrees with *Ravenna* that, "by requiring the Plan to be confirmed within 180 days, Congress intended to prevent the debtor from filing a Plan and then failing to obtain confirmation within a reasonable period." 20 B.R. at 891.

This Court believes that the "anomalous result" of *Trainer's* and *Barker* can be avoided, and the result favored as "more judicious" by *Collier's* can be achieved, by construing § 1121(c)(3) as not becoming operative at all unless and until the debtor files a plan. Thus, § 1121(c)(3) can and should be construed as if it read that the exclusive period ends if "the debtor has filed a plan but that plan has not been accepted" within 180 days (or any extension thereof).

Sections 1121(c)(2) and (c)(3) relate to two different acts, within two consecutive time periods. But unless and until the first act takes place, the second act—and its time period—simply do not yet come into play. Logically, a plan cannot be accepted until it has been filed; hence, § 1121(c)(3) does not become operative until a plan has been filed.[5] Therefore, however many times and for whatever periods extensions are granted for the carrying out of the first act, the time limit for carrying out the second act has no applicability until the first act—the filing of the debtor's plan—has actually taken place. At that point, the time period for accomplishing the second act becomes relevant again, and at or before that point the debtor must request an extension for completion of the second act—obtaining acceptances of the plan that has been filed.

This construction of the statutory language may not be the most obvious, but it avoids both the Scylla of the "anomalous result" in *Trainer's* and *Barker* and the Charybdis of ignoring and disobeying the "strictly" "technical reading" of the words Congress has chosen.[6] And the result is what *Collier* describes as "[a] more judicious course": "to extend the acceptance period automatically ... only to the date to which the filing period has been extended [subject to further extension on timely motion]."[7]

II. *The Debtor has amply demonstrated "cause" for the requested extension.*

MNC's second principal argument—that the Debtor has not shown sufficient "cause" for another extension—can be quickly disposed of.

The Debtor in this major and complex case has shown extraordinary diligence,

speed and skill, in the face of major obstacles, in progressing to the point where, less than a year after the filing of the petition, a plan and disclosure statement have already been filed and a disclosure statement hearing has been scheduled.

Major conflicts between management and owners and between management and labor were averted only at the very brink of the precipice of disaster and only after intensive court-sponsored negotiations. The Debtor's immediate, pressing needs at the outset of the case for the use of cash collateral, for a multimillion dollar line of credit, for a wide variety of insurance coverages, and for utility services (especially worldwide telecommunications services) from almost 100 separate utility companies, were all dealt with promptly and skillfully. Finally, the Debtor, the Creditors' Committee and the Union representing many of the Debtor's employees, working together, engaged in a painstaking but extraordinarily swift and extraordinarily successful effort to find a buyer willing to commit substantial present and future resources to UPI.

The result is that a company which had not made a profit in the quarter century before it filed for bankruptcy in 1985 and which had been "sold" in 1982 in a transaction in which the "seller" actually paid the "buyer" rather than *vice versa,* is now, only a year after filing for bankruptcy, well on its way to being sold for over $40 million dollars to a buyer with sufficient experience and wealth to assure its continued viability for the foreseeable future. That is indeed a remarkable achievement!

In light of this background, the short additional three-month extension now requested for both filing the plan and obtaining acceptances is clearly reasonable. Indeed, the record of this case compels the inference that the major if not the sole

---

5. That the language of § 1121(c)(3) is susceptible to this construction may become clearer than it would otherwise be through the use of hyphens; thus, the exclusive period ends if "the debtor has not filed a plan-that-has-been-accepted" within 180 (or more) days. The point is that, in terms of grammatical construction, the object of the clause which comprises

§ 1121(c)(3) can be the entire word sequence "plan that has been accepted ...", not simply the word "plan."

6. 5 Collier on Bankruptcy, ¶ 1121.03, p. 1121–9.

7. Ibid.

reason that the Debtor needs additional time now is the avalanche of appeals and adversary proceedings, as well as a separate multimillion dollar lawsuit, filed by MNC and its ally Financial News Network, Inc. ("FNN")[8] against the Debtor, the Debtor's prospective purchaser, the Union, the Creditors'. Committee and others, all for the apparent purpose of preventing the Debtor from filing and obtaining acceptances and confirmation of any plan other than one that may be proposed by MNC and FNN.

In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan. This Debtor has obviously demonstrated more than sufficient cause for the short extension now being granted, and MNC—of all parties—cannot credibly maintain to the contrary.

III. *This Court's Consent Order, abolishing the Debtor's Board of Directors and authorizing its management to file a plan in its name, is valid under both Delaware and bankruptcy law.*

MNC's third principal argument in opposition to the Debtor's motion to extend the exclusivity period to June 30, 1986, is that, notwithstanding the express language of the Consent Order entered on May 28, 1985 and signed by both MNC and MNC's principal stockholders ("the Consent Order"), UPI's management may not propose a plan at all, at any time, because (MNC says) UPI's Board of Directors has been unlawfully abolished by the Consent Order, rendering that Consent Order null and void. MNC raises that same argument as its sole ground of objection to the filing of a plan by UPI's management in UPI's name.

MNC earlier had argued that it had the right to file a plan under the terms of the Consent Order. However, the express language of the Consent Order itself clearly refutes that argument. Paragraph 3 on page 5 of that Order provides:

[Luis] Nogales shall be, and shall have complete and exclusive operating authority as, Chairman and chief executive officer of UPI. As such, but subject to the provisions of paragraph 4 hereof, Nogales shall have exclusive authority to manage the affairs of UPI in the ordinary course of the business of UPI including but not limited to all operations, the retention and termination of personnel, professionals, consultants and the like. Nogales shall have the exclusive authority to appoint and retain officers but not directors of UPI...

Paragraph 4 (pp. 5–6) provides:

As to any transaction outside of the ordinary course of business as hereafter defined, Nogales acknowledges that such transaction cannot be effected without approval of this Court... Nogales shall give at least three days' notice in advance to MNC of any proposed transaction outside of the ordinary course of business ...

\* \* \* \* \* \*

In the event that MNC disagrees with the proposed action to be taken, management will have the right to proceed with the taking of such action in the name of UPI only by order of this Court. Notwithstanding anything to the contrary under applicable law, for purposes of this Order, "outside of the ordinary course of business" shall include: entering into any contract to last more than one year other than one which entails total obligations of less than $50,000; the sale of any assets having a value in excess of $50,000; the filing of a Plan of Reorganization, a consent to or motion for the appointment of a trustee, for conversion to Chapter 7, or for dismissal of these proceedings under Chapter 11.

Thus, unless the Consent Order is (as MNC now argues) null and void, Nogales has "complete and exclusive operating authority" as to UPI, subject only to the requirements of three days' advance notice to MNC and approval by this Court for any transaction "outside of the ordinary course

---

8. FNN holds an irrevocable proxy or proxies from the major stockholders of MNC.

of business" with which MNC does not agree. That "complete and exclusive ... authority" includes, specifically and most significantly, authority for "the filing of a Plan of Reorganization."

■ MNC had also earlier argued that this Court's grants of authority first to the Creditors' Committee,[9] and later to the Wire Service Guild ("WSG"),[10] to file a non-liquidation plan under certain conditions, having breached the Debtor's right of exclusivity to any extent at all, thereby *ipso facto* breached it *in toto*.[11] This Court rejects that argument. It fails to take into account: (1) MNC's own consent, in the Consent Order, to allowing the Creditors' Committee—but not MNC—to file a plan; (2) this Court's broad equitable powers, in the context of the particular facts and circumstances of this case;[12] and (3) the specific provision in this Court's September 26, 1985 Order permitting MNC to ask leave of this

**9.** Under ¶ 6 of the Consent Order.

**10.** WSG is the Union representing many of the Debtor's employees. This Court's September 26, 1985 Order extending the exclusivity period granted WSG essentially the same right to file a non-liquidation plan under certain conditions as had previously been granted to the Creditor's Committee by the Consent Order.

**11.** That argument is of course inconsistent with MNC's request, prior to the September 26, 1985 Order, that it be allowed to *join* the "exclusivity club"—i.e., that it be granted plan-filing rights similar to those of WSG and the Creditors' Committee.

**12.** See 11 U.S.C. §§ 105, 1107(a) and 1121; In re Gaslight Club, Inc., 782 F.2d 767 (7th Cir.1986). Section 105(a) authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code; § 1107(a) states that the rights and powers of a debtor in possession are "[s]ubject to ... such limitations or conditions as the court prescribes ..."; and § 1121(d) authorizes the court to "reduce or increase" the debtor's exclusivity period "for cause."

All parties in a Chapter 11 case are usually best served by the speedy filing (and adoption) of a plan that both preserves the debtor as a going concern and realizes full going-concern value. Here, a major reason for permitting the

Court to file a plan, at any time that it has a plan ready for filing.

■ MNC's present argument—that the Consent Order is null and void because it unlawfully abolished UPI's board of directors—must fail in the face of the recent, well-reasoned and persuasive decision in *In re Gaslight Club, Inc.*, 782 F.2d 767 (7th Cir.1986), and authorities cited therein. In *Gaslight*, at the request of the creditors' committee, and with the consent of the debtor's then president and majority shareholder, the court designated a new individual with "full and exclusive" authority to exercise debtor-in-possession powers. When that individual discharged the majority shareholder in his capacity as president, he filed a motion to appoint a trustee or to vacate the prior consent order, arguing (*inter alia*) that the bankruptcy court lacked authority to issue that consent order. The Court of Appeals disagreed, citing 11 U.S.C. §§ 105(a) and 1107(a),[13] and stating:

Creditors' Committee to file a plan, even before expiration of the initial, 120-day exclusivity period, was the prospect that continued conflict between management and stockholder would lead to a stalemate in which no plan at all could feasibly be filed in the name of this Debtor. Later, WSG was allowed to "join the exclusivity club" in the wake of serious conflict between management and labor (in which a disastrous complete shutdown was only narrowly averted) and in recognition of the special need by a wire service company for a dedicated, highly motivated reporters' work force.

This case involves several thousand creditors. "Opening the floodgates" to allow each and every one of them to file a plan, no matter how poorly conceived or supported, would not serve "to secure the expeditious and economical administration of" this case (see Bankruptcy Rule 1001) nor "to carry out the provisions of" the Bankruptcy Code (see 11 U.S.C. § 105(a)).

Thus, this Court adopted a middle approach, initially suggested by the parties themselves—opening up the right to file a plan on a limited basis to those two entities (besides the Debtor itself) that have the most at stake in this case and have shown themselves to be responsible parties, while refraining from opening the floodgates completely. The statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication.

**13.** See the first paragraph of footnote 12 above.

The case law demonstrates that the court has considerable authority to interfere with the management of a debtor corporation in order to protect the creditors' interests.

The Court of Appeals went on to discuss several cases, including four that are particularly pertinent here:

(1) *In re Lifeguard Industries, Inc.*, 37 B.R. 3 (Bankr.S.D.Ohio 1983): the court held that a majority shareholder would not be permitted to install a new management slate; further, the board of directors was ordered not to interfere with the day-to-day operations of the corporation.

(2) *In re Potter Instrument Co.*, 593 F.2d 470 (2d Cir.1979): the Court of Appeals held that the bankruptcy court was justified in denying the majority shareholder's petition, under the corporate by-laws, for a special meeting to elect new directors.

(3) *In re Boileau*, 736 F.2d 503 (9th Cir. 1984): the Court of Appeals implicitly approved a consent order removing the debtor entirely from business management and operations and appointing an examiner with expanded powers.

(4) *In re FSC Corp.*, 38 B.R. 346 (Bankr. W.D.Pa.1983): FSC had no officers or board of directors when it was put into bankruptcy. The bankruptcy court appointed a "responsible officer" to perform the duties of the debtor and, by a later order, authorized him to vote the shares of and elect directors for the debtor's subsidiaries. When that order was challenged, the court upheld it as being permitted by, *inter alia*, §§ 226 and 303 of 8 Delaware Corporation Law.

Section 303 is the very same provision upon which MNC principally relies in the instant case.[14] MNC argues that § 303 impliedly prohibits the abolition of a Delaware corporation's board of directors by means of a consent order of a bankruptcy court, at least prior to the filing of a proposed plan. *In re Gaslight Club, Inc., supra*, 782 F.2d at 772, holds, to the contrary, that § 303 *permits* the post-bankruptcy but pre-plan *creation* of a vacancy among a corporation's officers or directors. Thus:

> ... when [Gaslight's president and majority shareholder, not having filed a proposed plan], consented to be replaced by [someone else] as the person in control, a vacancy was in effect *created* ... Section 303 seems to address the situation before us now.... Gaslight Club Inc. is a Delaware corporation and hence section 303 of the Delaware Corporation Law is potentially as applicable to Gaslight as it was to FSC. (Emphasis in original.)

Moreover, MNC's argument ignores the breadth of the language used in § 303. The plain intent of § 303 is to recognize and accord plenary authority for the reorganization court to issue decrees and orders relative to the reorganization. Hence, § 303 should be construed broadly to effectuate that intent rather than narrowly and restrictively, in derogation of that intent.

---

**14.** *Section 303 provides:*

(a) Any corporation of this State, a plan of reorganization of which, pursuant to the provisions of any applicable statute of the United States relating to reorganizations of corporations, has been or shall be confirmed by the decree or order of a court of competent jurisdiction, may put into effect and carry out the plan and the decrees and orders of the court or judge relative thereto and may take any proceeding and do any act provided in the plan or directed by such decrees and orders, without further action by its directors or stockholders. Such power and authority may be exercised, and such proceedings and acts may be taken, as may be directed by such decrees or orders, by the trustee or trustees of such corporation appointed in the reorganization proceedings (or a majority thereof), or if none be appointed and acting, by designated officers of the corporation, or by a master or other representative appointed by the court or judge, with like effect as if exercised and taken by unanimous action of the directors and stockholders of the corporation.

(b) Such corporation may, in the manner provided in subsection (a) of this section, but without limiting the generality or effect of the foregoing, alter, amend, or repeal its by-laws; constitute or reconstitute and classify or reclassify its board of directors, and name, constitute or appoint directors and officers in place of or in addition to all or some of the directors or officers then in office ...

■ Section 303(a) refers not only to "a plan ... [that] has been ... confirmed ...," but also to "a plan ... [that] shall be confirmed ..." Thus, as *Gaslight* and *FSC* both hold, the actual filing or confirmation of a plan is not essential for § 303 to become operative. Section 303 authorizes a Delaware corporation in a Chapter 11 case to "put into effect and carry out ... the decrees and orders of the [bankruptcy] court or judge relative ... [to a plan] ... without further action by its directors or stockholders" and "with like effect as if exercised and taken by unanimous consent of the directors and stockholders of the corporation." The recitation in § 303(b) of authority to "constitute or reconstitute and classify or reclassify" the board of directors is expressly declared to be "without limiting the generality or effect of" subsection (a). MNC's contention that subsection (b) "does not recognize a power to abolish the board of directors" [15] ignores this language and ignores the plain intent of § 303 to recognize and accord expansive authority in the bankruptcy court. [16]

Finally, this Court refers to *In re Johns-Manville Corp.*, 52 B.R. 879 (Bankr.S.D.N.Y.1985), where the court enjoined a Delaware state court action to compel the debtor (a Delaware corporation, like UPI) to hold a shareholders' meeting. That court too relied in part on the authority of § 303(a) of the Delaware Corporation Law. The court there stated (52 B.R. at 885):

Once a corporation becomes a debtor under Chapter 11, its directors are no longer allowed to pursue parochial interests but have broader fiduciary obligations which encompass all aspects of the reorganization.

MNC also relies on § 141(a) of 8 Delaware Corporation Law, which provides:

The business and affairs of every corporation organized under this Chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this Chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this Chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.

Finally, MNC relies on § 223(a) of 8 Delaware Corporation Law, which provides:

(a) Unless otherwise provided in the certificate of incorporation or bylaws:

\* \* \* \* \* \*

If at any time, by reason of death or resignation or other cause, a corporation should have no directors in office, then any officer or any stockholder or an executor, administrator, trustee or guardian of a stockholder, or other fiduciary entrusted with like responsibility for the person or estate of a stockholder, may call a special meeting of stockholders in

**15.** MNC's Memorandum in Opposition to UPI's Motion for Extension of the Exclusivity Period, filed March 17, 1985, p. 17.

**16.** This Court, like the Seventh Circuit Court of Appeals in Gaslight and the Second Circuit in Potter Instrument, of course recognizes that:

the right of the majority of stockholders to be represented by directors of their own choice and thus to control corporate policy is paramount and will not [ordinarily] be disturbed ...

*In re Gaslight Club, Inc.*, supra, 782 F.2d at 770, fn. 7; *In re Potter Instrument Co.*, 593 F.2d 470, 475 (quoting *In re J.P. Linahan, Inc.*, 111 F.2d 590, 592 (2d Cir.1940).

The cases cited by MNC are clearly distinguishable. *Potter Instrument, supra,* sufficiently distinguishes *Linahan, supra.* In *Sax-*

*on Industries, Inc. v. NKFW Partners,* 488 A.2d 1298, 1301 (1985), the Delaware Supreme Court pointed out that "the shareholders ... have received the approval of two bankruptcy courts" to sue to compel an annual meeting in order to elect directors. In the instant case, ¶ 10 on pp. 10–11 of the Consent Order (see also ¶ 2 on pp. 2–3) expressly required dismissal of the Delaware state court suit that MNC had brought. The other cases cited by MNC did not involve corporations that were in bankruptcy and hence did not involve the need, which the Delaware Supreme Court explicitly recognized in *Saxon, supra,* to strike "an appropriate balance ... between the Bankruptcy Code and ... [Delaware] Corporation Law." 488 A.2d at 1302.

accordance with the certificate of incorporation or the bylaws or may apply to the Court of Chancery for a decree summarily ordering an election as provided in § 211 of this title.

Section 141(a) explicitly recognizes two situations in which a board of directors is not needed: when "otherwise provided [i] in this Chapter or [ii] in its certificate of incorporation." Section 223(a) provides for two alternative methods for creating a board of directors when none exists but in both instances uses the word "may" rather than "shall," thus impliedly leaving the door open for yet other alternatives—such as simply not filling the vacancies when there is no real need to do so.

MNC argues that § 141(a) should be interpreted to exclude every other possibility for a corporation to operate without a board of directors than the two situations expressly described in § 141(a). And MNC argues that § 223(a) means "[t]hat a Delaware corporation must at all times have a board of directors." MNC thus would exclude the possibility that a "court of competent jurisdiction," acting pursuant to the provisions of the corporate reorganization "statute of the United States" (see 8 Del. Corp. Law § 303(a)), and with the consent of the affected parties, can accomplish the same thing as could unquestionably be accomplished, in strict accordance with the literal language of § 141(a), simply by amending the certificate of incorporation.

■ This Court disagrees. The maxim *expessio unius est exclusio alterius*, referred to by MNC, has no applicability in this context. *Cf.*, instead, *United States v. Little Lake Misere L. Co.*, 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973) (referring to "the inevitable incompleteness presented by all legislation ...."). As explained above, this Court believes that § 303 supplies sufficient Delaware statutory authorization for this Debtor to operate, during the remaining pendency of its reorganization proceedings, without a board of directors. The omission from §§ 141(a) and 223(a), and perhaps from § 303, of explicit reference to the precise situation presented in this case, is at most a minor statutory lacuna which can and should be remedied by judicial interpretation.

■ But if this Court is wrong in its interpretation of Delaware law, then the supremacy clause of the Constitution provides ample authority for recognizing the priority of the provisions of the Consent Order, issued pursuant to the Bankruptcy Code, over any contrary provisions of state law.

In this case the Court can perceive no useful function that might be served by requiring the vacancies on UPI's board of directors to be filled. The most likely result would be to resurrect the bitter conflict, over the question of who are the rightful directors, that the Consent Order was designed to resolve. (See Consent Order, ¶¶ 2 and 3 on pp. 2–3.) The fiduciary obligations adverted to in *Johns-Manville*, which any directors would be bound by, have already been delegated to Mr. Nogales by this Court's Order, entered with MNC's consent.

Messrs. Ruhe and Geissler, MNC's majority shareholders, have also signed and are bound by the Consent Order. (Mr. Ruhe signed on Mr. Geissler's behalf as his attorney in fact.) To whatever extent, if any, the Consent Order may prevent Messrs. Ruhe and Geissler from discharging their fiduciary duties to MNC's minority shareholders (see MNC's Memorandum in opposition to extension of the exclusivity period, pp. 19–20), those fiduciary duties have under the Consent Order devolved upon Mr. Nogales, who has taken on the superseding responsibility of the "broader fiduciary obligations which encompass all aspects of the reorganization" of UPI. *In re Johns-Manville Corp.*, *supra*, 52 B.R. at 885.

For the reasons stated in Parts I, II and III above, this Court has overruled MNC's objections to the extension until June 30, 1986, of UPI's exclusivity period. For the reasons stated in Part III, this Court is today, *nunc pro tunc* as of April 8, 1986,

granting the Debtor's application for leave to file a plan and overruling MNC's objection to the Debtor's filing of a plan.

IV. *Certification for immediate appeal, as required by 28 U.S.C. §§ 158(c) and 1292(b), will be denied, because an immediate appeal will not "materially advance the ultimate termination" of this case.*

MNC's counsel has requested that I certify my decision extending the exclusivity period for interlocutory appeal pursuant to 28 U.S.C. § 158(c). Section 158 provides in relevant part:

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

\* \* \* \* \* \*

(c) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

It seems clear to me (although apparently it is not clear to the editors of *Collier's* [17]), that this language means that, in instances where a certification by a district judge under 28 U.S.C. § 1292(b) would be required in a case appealed from a district court to a court of appeals, just so is certification by a bankruptcy judge required on an interlocutory appeal from a bankruptcy judge's decision to a district judge. Thus, leave to appeal may not be granted solely on the initiative of the appellate, district judge.

Section 158(c) unequivocally requires that an appeal of an interlocutory order of a bankruptcy judge "*shall* be taken *in the same manner* as appeals in civil proceedings generally are taken to the courts of appeals from the district courts ..." (Emphasis added.) If this mandatory language means what it says, then the former practice, under former 28 U.S.C. §§ 1334(b) and 1482(b) [18] and under Bankruptcy Rule 8003, [19] of allowing discretionary appeals from interlocutory orders solely in the discretion of the district judge, without certification by the bankruptcy judge, is no longer authorized by Congress. [20] This is because the "manner" in which "appeals in civil proceedings generally are taken to the courts of appeals from the district courts" is governed, as to discretionary appeals from interlocutory orders, by 28 U.S.C. § 1292(b) [21]; and § 1292(b) unequivocally requires certification by the district court

---

**17.** See 1 Collier on Bankruptcy ¶ 3.03 at 3–111 (15th ed. 1985) ("The purpose of the phraseology of section 158(c) is unclear ...").

**18.** And under the 1898 Bankruptcy Act. Both § 1334 and § 1482 appear to have been rendered nugatory by § 122(c) of the 1984 Act, although § 121(a) of that same 1984 Act purports to provide for Title II of the 1978 Act, including those two sections, to "take effect on the date of enactment" of the 1984 Act. It would seem that §§ 1334 and 1482 should probably be regarded as implicitly repealed at least to the extent they are inconsistent with new § 158.

**19.** Rule 8003 derives its authority entirely from former 28 U.S.C. §§ 1334(b) and 1482(b). See footnote 18 above.

**20.** It is true that § 158(a) refers to "leave of the *court*"—singular, not plural (emphasis added). However, it is also true that the plural "courts" would be inaccurate under the 1984 Act's scheme of things, since the bankruptcy court is now a "unit" of the district court (28 U.S.C. § 151), and hence any interlocutory appeal will be from that bankruptcy "unit" to another segment of one and the same "court."

**21.** For discussion of the types of interlocutory orders that are appealable as of right, such as injunctions and "collateral" and "separable" orders, see 28 U.S.C. § 1292(a) and 9 Moore's Federal Practice, ¶¶ 110.10–110.12 and 110.19 (2d ed. 1985).

as well as leave of the court of appeals. Therefore, I hold that, except in cases involving appeals of right, certification by the bankruptcy judge, as well as leave of the district judge, is now required for appeals to a district judge from an interlocutory order or decree of a bankruptcy judge.

 In this case, I decline to grant the requested certification for two reasons. First, I am bound by the decision of District Judge Oberdorfer dismissing MNC's appeal from my last previous order extending the Debtor's exclusivity period. Referring to the last paragraph of that order, which authorized MNC to seek leave of this Court to file a Plan, Judge Oberdorfer held:

Because the bankruptcy court has not fully passed upon the question of whether other parties, particularly the party pursuing this appeal, should have the right to file a competing plan, an immediate appeal would complicate, rather than facilitate, ultimate resolution of this case.

Second, I have independently arrived at the same conclusion as Judge Oberdorfer: contrary to the requirement of § 1292(b), an immediate appeal will not "materially advance the ultimate termination" of this case. The March 31, 1986 Order extending the exclusivity period continues MNC's right to request leave of this Court to file a plan. If MNC exercises that right and this Court *grants* leave, then MNC will have achieved its objective without the delay and expense of an appeal. If MNC exercises that right and this Court then *denies* leave, this Court will at that time grant the § 1292(b) certification (if MNC then requests it).

### ORDER GRANTING APPLICATION FOR LEAVE TO FILE PLAN OF REORGANIZATION

Upon the Debtor's Application For Leave to File Plan of Reorganization, dated April 4, 1986, ("Application") and following a hearing on the Application and the Objection of Media News Corporation thereto, in which counsel for the Debtor, the Creditors' Committee and Media News Corpora-

tion and the Secretary-Treasurer of the Guild participated, it is

FOUND, for the reasons explicated in this Court's opinion of April 22, 1986, issued in connection with this Court's Order Further Extending the Exclusivity Period for Filing Plan of Reorganization,

(a) that good cause exists for the Debtor's filing of the plan of reorganization and disclosure statement submitted with the Application, and;

(b) that pursuant to the Consent Order with Respect to Management and Related Issues entered May 28, 1985, Luis Nogales is fully authorized to file a plan of reorganization and disclosure statement on behalf of the Debtor;

THEREFORE, it is

ORDERED, that the Debtor is granted leave to file the plan of reorganization and disclosure statement submitted with the Application, and that such plan of reorganization and disclosure statement shall be deemed filed as of April 8, 1986.