**In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.**

**Bankruptcy No. 88–00043.**

United States Bankruptcy Court,
D. New Hampshire.

June 22, 1988.

Supplemental Order On Plan Exclusivity
Extension June 22, 1988.

Richard Levin, Don Willenburg, Stutman, Treister & Glatt, Los Angeles, Cal., Thomas R. Jones, Cahill Gordon & Reindel, New York City, Martin L. Gross, Sulloway, Hollis & Soden, Concord, N.H., for Debtor PSNH.

Joel B. Zweibel, Kenneth H. Eckstein, Kramer, Levin, Nessen, Kamin & Frankel, New York City, J. Michael Deasy, Deasy & Dwyer, P.A., Nashua, N.H., for creditors' committee.

Richard Tilton, Howard J. Berman, Whitman & Ransom, New York City, for equity committee.

Mark W. Vaughn, Devine, Millimet, Stahl & Branch, P.A., Manchester, N.H., Larry M. Smukler, Sr. Ass't Atty. Gen., Office of the Atty. Gen., Concord, N.H., for State of N.H.

George J. Wade, Shearman & Sterling, New York City, David J. Dunfey, Sanders & McDermott, P.A., Hampton, N.H., for Citicorp and CUC, Inc.

Anthony C. Marts, Wiggin & Nourie, Manchester, N.H., John Pritchard, Winthrop, Stimson, Putnam & Roberts, New York City, for First Fidelity and Amoskeag Bank.

Virginia Greiman, Boston, Mass., U.S. Trustee.

Edward F. McHugh, Jr., Nutter, McClennen & Fish, Boston, Mass., for 2d Mortg. Indentured trustee.

John B. Nolan, Day, Berry & Howard, Hartford, Conn., for Northeast Utilities.

Richard Johnson, Bingham, Dana & Gould, Connie L. Rakowsky, Orr and Reno, P.A., Concord, N.H., for New England Elec. System.

Daniel M. Glosband, Goodwin, Procter & Hoar, Boston, Mass., for Joint Owners.

Michael J. Reilly, Hebb & Gitlin, Hartford, Conn., for Prudential.

Joel B. Rosenthal, Shapiro, Israel & Weiner, P.C., Boston, Mass., for Com. of Mass.

Joan E. Pilver, Asst. Atty. Gen., Hartford, Conn., for State of Conn.

## MEMORANDUM OPINION ON PLAN EXCLUSIVITY EXTENSION

JAMES E. YACOS, Bankruptcy Judge.

This chapter 11 case was commenced by a voluntary petition filed by the debtor on January 28, 1988. Accordingly, the debtor's statutory 120-day exclusive period within which to file a plan of reorganization under 1121(b) of the Bankruptcy Code was scheduled to expire on May 27, 1988. On April 28, 1988 the debtor filed a motion for an eight-month extension of its exclusive period to file a plan, i.e., an extension to January 27, 1989. Section 1121(d) of the Code provides that the court may "for cause" reduce or increase the 120-day period after appropriate notice and hearing.[1]

After due notice, an all-day evidentiary hearing was held before the court on May 19, 1988 to consider the debtor's request for an extension of the statutorily-prescribed exclusivity period. Two representatives of First Boston Corporation, an investment banking firm appointed by the court as the debtor-in-possession's financial advisor, testified at length as to organizational activities in getting ready to formulate a plan of reorganization on behalf of the debtor. The assistant treasurer of the debtor was called to testify in detail as to a "base line" computer program that had been developed during the course of the proceedings to provide all interested parties with a computerized, schematic picture of the debtor's current financial and operational condition. This base line "model" of the debtor and its existing operations was on the verge of completion at the time of

---

**1.** The Bankruptcy Code appears in Title 11, U.S. Code as sections 101 et. seq. This opinion will use the Bankruptcy Code section numbers only for easy reference.

the May 19, 1988 hearing. The model was to be made available to all qualified negotiating parties, who could then run their own assumptions for an appropriate plan on the debtor's main frame computer in order to evaluate their options and alternative approaches to a reorganization plan.

The debtor's president and chief executive officer was called to testify as to various problems that led the debtor into this chapter 11 reorganization filing. He testified that the debtor had a very sound core operation with regard to its electrical generating and distribution system, except for unresolved regulatory and licensing problems regarding its completed but not fully licensed nuclear power plant located at Seabrook, New Hampshire. He also testified as to four "major scenarios" as to possible reorganization plans that the debtor was contemplating but which required further development of necessary data and resolution of various uncertainties.[2]

The debtor's vice-president and general counsel was called by a party objecting to the extension request to testify as to the history of the regulatory and licensing hearings relating to bringing the Seabrook nuclear plant on line and into the ratebase that would generate additional revenues for the debtor. The delay of approximately one year after completion of the Seabrook nuclear plant, without being able to bring it on line and generate revenues, constituted the chief cause for the chapter 11 filing, because the debtor's cash flow reached a point at which the debtor could no longer service all of its secured indebtedness and still maintain normal operations on the rest of its system. The general counsel testified that the Seabrook plant had obtained its 40-year general operating license from the Nuclear Regulatory Commission (hereinafter "NRC"), but its becoming operational had been delayed due to delay in obtaining necessary approval of various federal and state agencies relating to a safe evacuation plan concerning any possible accidents at the nuclear plant.[3]

In pleadings filed prior to and at the May 19th hearing, the debtor's request for extension was generally supported by the Official Committee Of Unsecured Creditors (hereinafter "Creditors Committee"), but with the suggestion that the extension be limited to six months. The Committee Of Equity Security Holders (hereinafter "Equity Committee") supported the full eight-month extension request, as did the United States Trustee. The extension request was also generally supported by certain of the joint owners of the Seabrook project.[4]

The State of New Hampshire contended that an early termination of debtor plan exclusivity was essential to resolving the manifold issues presented by this reorganization and opposed any exclusivity extension beyond three months.

2.  In addition to the live testimony received at the May 19, 1988 hearing, all parties involved submitted voluminous declarations and affidavits and various supporting documents in support of their respective positions. The court will not attempt to summarize all such materials in this opinion but said materials were reviewed in detail prior to and subsequent to the hearing.

3.  The possibility of achieving a safe evacuation plan had been challenged by various citizens groups and by the Commonwealth of Massachusetts. The Commonwealth of Massachusetts, through its governor, asserted that *no* safe evacuation plan could be devised to protect several towns in Massachusetts located within the relevant 10-mile zone around the Seabrook plant. The Commonwealth of Massachusetts therefore refused to cooperate in trying to develop any such evacuation plan. The State of New Hampshire has cooperated in the development of an appropriate evacuation plan. The NRC, during the past year, changed its relevant rule to permit the nuclear plant owner to submit an evacuation plan in the absence of cooperation by local or state authorities. That change in rule is presently pending on appeal in the United States Court of Appeals for the First Circuit on a challenge brought by the Commonwealth of Massachusetts and other parties. Argument on the appeal was had in the court of appeals on June 7, 1988.

4.  The Seabrook nuclear plant is actually owned by a combination of a number of New England utilities. The debtor is the lead owner, with a 35.57 percent ownership share in the project, and acts in effect as the managing agent with regard to the plant through its New Hampshire Yankee Division. The "joint owners" responding to the extension request represent various utilities holding in total a 36 percent ownership share in the Seabrook project.

The Maryland National Bank as trustee under a "first mortgage indenture", and the Bank of New England, N.A. as indenture trustee for the "G & R Mortgage Bonds" (hereinafter collectively referred to as "Senior Indenture Trustees") opposed the full eight-month extension and suggested a four-month extension instead. The Senior Indenture Trustees did indicate that the six-month extension recommended by the Creditors Committee would not be unreasonable. The Senior Indenture Trustees did not otherwise take an active part in the proceeding.[5]

The most active opposition to the extension request at the May 19, 1988 hearing came from the First Fidelity Bank, National Association, New Jersey, and Amoskeag Bank, New Hampshire, as Indenture Trustees for the Third Mortgage Bond Holders under the "Third Mortgage Indenture", and from Consolidated Utilities & Communications, Inc. and Citicorp, holders of a large block of the third mortgage bonds (hereinafter referred to collectively as "The Third Mortgage Bond Holders"). On various grounds, the Third Mortgage Bond Holders opposed any exclusivity extension beyond a two-month extension, i.e., an extension to July 27, 1988.

Prior to the convening of the May 19, 1988 hearing on the exclusivity motion, the court entered a Procedural Order on April 29, 1988 relating to the conduct of the exclusivity hearing, and included certain specific questions to be briefed by the parties prior to the hearing (Court Document # 613). A copy of that Procedural Order is included as "Annex A" in the appendix of this opinion.

Following the May 19th hearing, in view of the imminent expiration of the statutorily-prescribed exclusivity period and in the absence of the transcript of the hearing, the court on May 26, 1988 entered an order extending the exclusivity period for 120 days, i.e., until September 26, 1988 (Court Document # 775). The court found that, due to the unusual activities and court procedures during the first 120-day period following the filing of the chapter 11 petition, another 120-day period was justified in order that "the debtor ... [may] now ... get—in practical terms and in the spirit of the statute—the benefit of the statutory exclusive period." A copy of the order of May 26, 1988 is included as "Annex B" in the appendix to this opinion.

The order granting the 120-day extension included a provision that, upon review of the transcript of the hearing and other evidence submitted, the court would determine by supplemental order whether any further extension beyond September 26, 1988 would be granted. This Memorandum Opinion, and its accompanying supplemental order, now provides that determination.

## NATURE OF DEBTOR AND CASE

This chapter 11 proceeding is unique in that it involves the reorganization of a regulated monopoly utility company owned by private investors.[6] The case is also unique in the sense that it involves an otherwise financially sound utility company that but for the delay in getting a completed nuclear power plant on line would not have had any need for bankruptcy relief. The delay in getting Seabrook "on line" did not stem from economic factors in the ordinary sense, but rather from an assortment of historical events, including active opposition by certain citizen environmental and safety groups, which have lengthened the regulatory process considerably. For various historical, political and other reasons it apparently has been possible to put $5.5 billion into the ground at the Seabrook plant location *before* determining whether the location would permit safe evacuation

---

5. This court, on April 25, 1988, issued an "Order For Certain Payments With Respect To Certain Senior Secured Debt" (Court Document # 571), under which the debtor has been authorized to continue interest payments on the senior obligations that are the concern of the Senior Indenture Trustees.

6. The term "private" is somewhat misleading in this context inasmuch as there are thousands of shares of the debtor owned by the public at large, albeit as "private-investors" as contrasted with a municipally-owned utility.

of the public in the event of an accident.[6A] The delay itself has increased the cost of the completed plant to the point where the "economics" of putting the plant on line, i.e., the effect on rates, have now added substantial economic questions for the reorganization effort.

There in fact have been *no* reorganization cases in the federal courts dealing with privately-owned utility companies since the 1930's. Moreover, the reorganization cases from that prior period usually involve layers of public utility holding companies with convoluted financial dealings that are in no sense analogous to the present proceeding.[7] In a real sense it may well be said that this case is unprecedented. In terms of assets and liabilities it apparently is the fourth largest bankruptcy case of any that are on record.

The size and scope of the debtor's operations are well summarized in the memorandum of the debtor in support of its extension request:

Public Service is the largest electrical utility in New Hampshire, providing electricity to nearly three-quarters of the State's population, by sales at retail to approximately 350,000 customers in over 200 cities and towns and at wholesale to five municipalities and utilities. It employs 2700 people. Its annual revenues exceed $500 million, its assets and liabilities exceed $2 billion. Public Service has tens of thousands of public and private creditors and equity holders, hundreds of executory contracts and leases. Its public debt consists of 24 series of bonds and debentures, its public equity of 14 separate series. Its debt issues differ in security, priority, interest rate, maturity, and other terms. Its equity issues differ in par value, dividend rights, voting rights, and priority. Public Service is the defendant in several securities law suits.

Although Public Service is engaged in a "single" business, the business and the scale on which it must be conducted is unusually complex. Public Service has three fossil fuel generating plants, five hydro-electric plants, interests in five operating nuclear generating stations, and over a hundred contracts for the purchase of power from small power producers and cogenerators. Public Service also obtains power under one of the most sophisticated power pool arrangements in the country, the New England Power Pool (NEPOOL), which provides for joint planning and operation of generation and transmission facilities among member utilities. Public Service operates and maintains 1720 miles of transmission lines, 212 transmission and distribution substations, and all of the assets necessary to supply customers. Public Service is the minority lead owner of the completed but not yet generating Seabrook Nuclear Generating Station and has responsibility, through the 780 employees of its New Hampshire Yankee Division, for the maintenance and operation of the plant.

Public Service is subject to extensive regulation of every aspect of its business by the New Hampshire Public Utilities Commission (NHPUC) and the Federal Energy Regulatory Commission (FERC). Its Seabrook project is subject to licensing and regulatory jurisdiction of the Federal Nuclear Regulatory Commission (NRC). The public utility commissions in Connecticut, Maine, and Vermont, also assert regulatory jurisdiction from time to time and over certain matters. The utility commissions that regulate the other Seabrook joint owners have an effect on Public Service's business through mechanisms such as prudence audits relating to the Seabrook construction and operation. [Court Document 594, at pp. 3–5]

Other pertinent aspects of the debtor's size and scope are established in the record

---

**6A.** For an account of the background history regarding nuclear power plants and their problems in the United States see James Cook, "Nuclear Follies," *Forbes,* February 11, 1985, pp. 82–100.

**7.** Remarks of Aaron Levy, Director of the Office of Public Utility Regulation at the Securities Exchange Commission, quoted in *New York Times,* June 26, 1984, at 30. *See also, Article,* 50 Albany Law Review 641, fn. 3 (1986).

of these proceedings as follows: (1) The debtor lists total assets of $2.893 billion (including $1.813 billion for Seabrook) and $1.609 billion in liabilities; (2) The outstanding principal of the senior secured debt is approximately $441 million; (3) The outstanding principal of the third mortgage secured debt is approximately $325 million; (4) The unsecured debt represented by the Creditors Committee is in excess of $900 million; (5) The senior secured debt is being paid current interest under court order and the third mortgage bonds are accruing interest in excess of $3.4 million per month; and (6) The debtor's earnings before interest and taxes is in excess of $130 million per year.

As for the effect of these reorganization proceedings upon the debtor and other parties in interest, and the effect of delay herein, it can be noted that professional fees and expenses unique to the reorganization may well exceed one million dollars per month.[8] It can also be noted as a *functional* "administrative cost of delay" that the unsecured creditors are losing perhaps in excess of ten million dollars per month in lost interest on their monies because they will not be paid interest under reorganization law.

A full picture of the nature of the debtor in this case also requires recognition that chapter 11 as presently enacted does not lend itself easily or clearly to the unique problems presented by the reorganization of a regulated, monopoly utility entity. *See*, Eisenberg, *Bankruptcy in the Administrative State*, 50 Law & Contemp. Problems 3, 12–13 (1987).[9] *See also*, Robinson, *In re Blackacre Power and Light:*

*The Bankruptcy of a Public Utility*, 50 Albany L.Rev. 641, 643 (1986); Flaschen & Reilly, *Bankruptcy Analysis of a Financially—Troubled Electric Utility*, 22 Hous.L.Rev. 965, 967 (1985). Chapter 11 does have a subchapter (Subchapter IV, §§ 1161–1173) dealing with railroad reorganizations, but chapter 11 has no comparable provisions dealing with utility reorganizations. This situation apparently resulted historically from the assumption that a utility reorganization "just wouldn't happen" because the regulatory agencies involved could control financial problems by their rate setting.

Since most of the customers of an electric utility having a monopoly franchise from the state do not have any alternative to obtaining their electrical service from the franchised utility—unlike railroad users who have alternative options of automobile, truck and aircraft transportation available —it has been commented that the utility reorganization deserves separate treatment *more* than that justified in the case of railroad reorganizations. Robinson, *supra*, at 665, 668.

Another unique facet of this case, as has become increasingly obvious at the various hearings held before the court, is that the reorganization of a regulated monopoly utility company under chapter 11 presents an extensive and perplexing array of "circular questions" of both fact and law that are not normally found in a chapter 11 proceeding.[10] This circularity stems primarily from the provisions of § 1129(a)(6) of the Bankruptcy Code requiring regulatory approval of any rate changes included in a reorganization plan.[11] The circularity

---

**8.** The three investment bankers appointed separately as financial advisors to the debtor and the two committees alone have been authorized flat fees totalling $375,000.00 per month.

**9.** This article, which is probably the best and most detailed treatment of the questions involved in a utility reorganization, deals almost exclusively with problems of a nuclear plant utility reorganization notwithstanding its rather general title.

**10.** It has become abundantly clear to this court in the five months that have transpired in this proceeding that the deceptively simple and dis-

crete words "rates" and "ratebase", and "tariffs" and "prudency" that govern the utility regulation world are clearly overlapping and conflicting with the words "valuation" and "claims determination" and "sales of assets" and "fair and equitable" that largely govern the bankruptcy reorganization world.

**11.** Section 1129(a)(6) provides that "The court shall confirm a plan only if.... (6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approv-

is not due to that Bankruptcy Code provision alone, however, since it is inherent in the very concepts of "rates" and "rate-base" necessarily involved in the operations of a debtor of this nature.

The general subject of possible reorganization proceedings for a regulated utility company has been the subject of a number of recent law review articles. *See, e.g.,* Eisenberg, *Bankruptcy in the Administrative State,* 50 Law & Contemp.Probs. 3 (1987); Robinson, *In re Blackacre Power and Light: The Bankruptcy of a Public Utility,* 50 Alb.L.Rev. 641 (1986); Flaschen & Reilly, *Bankruptcy Analysis of a Financially—Troubled Electric Utility,* 22 Hous.L.Rev. 965 (1985); Gilbert, Olson & Lockett, *Prospects for Foundering Utilities: Bankruptcy, Utility Regulation and Public Policy,* Com.L.J., April 1985, at 150; Worenklein & Gerstell, *Public Utility Bankruptcy: Lessons for Management and Creditors,* Pub.Util.Fort., Dec. 6, 1984, at 26; Stewart, *A Bankrupt Electric Utility—What If?,* Pub.Util Fort., Sept. 15, 1983, at 15.[12] Alas, however, as the articles themselves recognize, they raise far more questions than they answer.

As will be developed later in this opinion, it would appear that the major task of achieving a consensual plan if possible in this proceeding will require creative lawyering and financial evaluation by all concerned to avoid a "World War III" jurisdictional conflict which could result if the parties involved ultimately have to resort to litigation to resolve the large gap left by Congress in chapter 11 in this context.

### DEBTOR'S SHOWING OF "CAUSE" FOR EXTENSION

The debtor's primary showing to justify an extension of its exclusivity period is based upon its assertion that this large and complex case simply requires more time for the debtor to grapple with the myriad of factors and uncertainties necessary for the negotiation of a consensual plan of reorganization. As indicated above, the court has already recognized that the unique complexity of this case has justified at least a 120–day extension beyond the May 27, 1988 statutory termination of the debtor's exclusivity period.

There is no question of course that this case is large and complex by anyone's definition. It will be useful, not only for present purposes but for future reference, to set forth at some length various aspects of that complexity. Fortunately for the court, the well-briefed positions of the various parties on the present motion set forth a number of the variables, uncertainties, and circular questions relating to a successful reorganization in this case. These assertions by the parties, I believe, are not seriously contested by any party for the purposes here employed.

It is not possible to understand the complexity of this case without some general understanding of the regulatory context within which the debtor must operate. Early in this proceeding the State of New Hampshire filed a useful, non-adversarial memorandum at the court's request detailing that regulatory context. (Court Document # 337) The following extracts are pertinent:

> In order to provide PSNH with appropriate compensation for the service it provides, the PUC is required, by statute, to set just and reasonable rates. RSA 378:27,28. *Appeal of Conservation Law Foundation of New England, Inc.,* 127 N.H. 606, 507 A.2d 652 (1986).
>
> In general, rates must be sufficient to provide the utility with a reasonable return on investment after expenses. In setting rates, the PUC typically looks at a recent historical period (the "test year") to determine the existing level of revenues, the amount of allowable expenses, the level of the utility's investment in property used and useful in serving the public (the "rate base") and the

---

al." See general discussion in Flaschen & Reilly, *supra,* at pp. 973–981.

**12.** For non-bankruptcy regulatory decisions dealing with the problems presented regarding rates and other matters in the case of abandoned power plants see citations in Eisenberg, *supra,* at fn. 183, p. 44.

rate of return that will be allowed. See generally *Appeal of Public Service Company of New Hampshire*, 125 N.H. 46, 480 A.2d 20 (1984), and *Appeal of Manchester Gas Company*, 129 N.H. 800, 533 A.2d 366 (1987). The test year results are adjusted to reflect known and measurable changes. Expenditures which are deemed "imprudent" or otherwise not properly chargeable to customers are excluded from the calculation of the revenue requirement.

The rate base consists primarily of the utility's generation, transmission and distribution plant as well as inventories, materials and supplies and an allowance for working capital. In the usual case, items of rate base are valued at their original cost when first devoted to public use less accumulated depreciation. As discussed in more detail below, a New Hampshire statute prohibits the inclusion in rate base of unfinished construction ("construction work in progress", or "CWIP").

The rate of return to be allowed is based on the utility's cost of capital. Establishing this return requires the determination of the appropriate capital structure and the costs of the various components of the capital structure. Calculation of the cost of debt and preferred stock is generally quite straight forward. The more uncertain and controversial determination is the "cost" of common stock equity. See, e.g., *Re: Pennichuck Water Works, Inc.*, 70 NHPUC 850, 856–864 (1985).

\* \* \* \* \* \*

A statutory limitation on the ratemaking process that has raised significant issues for PSNH is the so-called "anti-CWIP" statute, RSA 378:30–a, which provides as follows:

*Public Utility Rate Base; Exclusions.* Public utility rates or charges shall not in any manner be based on the cost of construction work in progress. At no time shall any rates or charges be based upon any costs associated with construction work if said construction work is not completed. All costs of construction work in progress, includ-ing, but not limited to, any costs associated with constructing, owning, maintaining or financing construction work in progress, shall not be included in a utility's rate base nor be allowed as an expense for rate making purposes until, and not before, said construction project is actually providing service to consumers.

See *Appeal of Public Service Company of New Hampshire*, 130 N.H. 265; 539 A.2d 263 (1988) and *Appeal of Public Service Company of New Hampshire*, 125 N.H. 46, 480 A.2d 20 (1985). In its January 26, 1988 decision, the New Hampshire Supreme Court held that this statute restricts the ability of the PUC to alter rates in emergency circumstances (*Id.* slip opinion at p. 15).

In addition to establishment of the revenue requirement, the ratemaking process also determines appropriate rate structure. Rate structure determination involves allocation of revenue requirements among the various customer classes and the pricing structure within the classes. See, generally: *Federal Power Commission v. Natural Gas Pipeline Company*, 315 U.S. 575, 584, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1941); Bonbright, J., *Principles of Public Utility Rates*, 66–81, 147–406 (1961); Priest, A., *Principles of Public Utility Regulation*, 45–226, 327–346 (1969).

\* \* \* \* \* \*

The PUC exercises authority over the terms and conditions under which service is provided. For example, tariff provisions approved by the PUC govern line extensions, initiation of service, interconnection requirements for customers and other matters necessary for the provision of safe and adequate service at just and reasonable rates.

\* \* \* \* \* \*

Under Section 369:1, the PUC regulates the issuance and sale by public utilities of stocks, bonds, notes and other evidences of indebtedness payable more than twelve months after the date of issuance. In addition, the PUC, pursuant to Section 369:2 regulates the mort-

gaging of the assets of utilities. The PUC also regulates the amount of short-term debt utilities may issue pursuant to RSA 369:7. The PUC also must approve any sale or lease of any utility's "franchise, works or system" or any part thereof prior to such sale or lease becoming effective. RSA 374:30.

\* \* \* \* \* \*

The PUC also has jurisdiction with respect to two special statutory powers designed to assist utilities in carrying out their public service functions; the power to acquire property by eminent domain and the authorization of zoning exemptions. Pursuant to RSA Chapter 371, the PUC presides over utility requests for the condemnation of private property rights necessary to provide utility service. Similarly, under RSA 674:30, the PUC may grant exemptions to utilities from local zoning and planning ordinances, codes and regulations.

\* \* \* \* \* \*

Section 210 of the Public Utilities Regulatory Policies Act ("PURPA"), 16 U.S.C. 824a–3, and the Limited Electrical Energy Producers Act ("LEEPA") RSA Chapter 362–A, provide certain small power production and cogeneration facilities ("SPP's") with a statutory right to sell electricity to PSNH. Under PURPA and LEEPA, the PUC regulates the terms and conditions of these transactions. The statutory framework authorizes electric utilities like PSNH to enter into private contracts with SPP's as an alternative to the PUC's rate setting process. See RSA 362–A:4.

Pursuant to PURPA and LEEPA, the PUC establishes short and long term rates for PSNH to pay to SPP's in Docket No. DE 83–62. 69 NHPUC 352 (1984). The PUC has revised the rates set in that docket via subsequent proceedings. See e.g.: *Re: Small Energy Producers and Cogenerators,* 71 NHPUC 408 (1986). Under the procedures developed under DE 83–62, an SPP must petition the PUC to receive rates from PSNH. Historically, the rates that are in effect at the time the application is made are the rates that

the applicant applies for and that the PUC considers providing to an applicant. *See Appeal of Public Service Company of New Hampshire,* 130 N.H. 285, 539 A.2d 275 (No. 87–008 January 29, 1988). In deciding whether to provide such an applicant with those rates, the PUC, in rendering its decision, considers whether the allowance of the requested rates, will meet the statutory criteria of PURPA and LEEPA. *Id.* [See Court Document # 337, pp. 4–12]

The debtor itself notes its own view of its place in the regulatory firmament, adding perhaps a few adversarial views as well, in its initial memorandum in support of its motion (Court Document # 594). The pertinent passage is as follows:

Outside of chapter 11, the NHPUC has general supervisory power over all public utilities and the plants owned, operated, or controlled by utilities to the extent required to exercise its specific statutory authority. It has a duty to keep informed as to all aspects of the management and operation of utilities and their compliance with applicable laws and regulations. N.H. RSA 374:3, 374:4. Outside of chapter 11, a public utility must obtain NHPUC approval, based on whether the proposed action is in the public good, to transfer or lease any or all of this utility property or to contract with another entity for the operation of its system. N.H. RSA 374:30, 374:31. A public utility must obtain NHPUC approval for the issuance of any debt or equity securities, for the mortgaging of any of its property, or for an increase in its capital stock or bonds beyond the amounts fixed by its articles of association, its charter, or any act of the General Court. N.H. RSA 369:1, 369:2, 367:7, 369:14. Approval extends not only to the kind of security or its amount but also to the purpose to which the issue proceeds will be applied, once again, based on the public good, and subject to reasonable terms and conditions as the NHPUC may find in the public interest. *Id.*

Inside a chapter 11, the bankruptcy court has exclusive jurisdiction over the

property of the debtor and over property of the estate. 28 U.S.C. § 1334(e). Any sale or other transfer of property of the estate is subject to the jurisdiction of the bankruptcy court, whether during the case, or under a plan. 11 U.S.C. §§ 363, 1123(a)(5). Gain on a sale is for the benefit of the estate and creditors. Rejection of contracts for the purchase or sale of power or fuel is explicitly subject to bankruptcy court approval. *Id.* § 365(a). The bankruptcy court has jurisdiction over the obtaining of credit and the issuance of debt, either secured or unsecured, during a chapter 11 case. *Id.* § 364. Similarly, issuance of new secured or unsecured debt or equity securities under a plan in satisfaction of prepetition claims and equity interests is subject exclusively to bankruptcy court approval. *Id.* §§ 1123(a), 1129, 1141, 1142.

Traditional ratemaking in New Hampshire is based on historical operating expenses (adjusted for known changes) plus the opportunity to earn a reasonable return on rate base. Return on rate base is calculated as a weighted average cost of capital, which includes the embedded cost of long terms debt, the embedded cost of preferred stock, and the cost of common equity, applied to the historical, depreciated cost of assets included in the rate base. If the cost of capital decreases, the NHPUC might assert that rates should be reduced. Outside of chapter 11, the NHPUC has authority to force such a reduction on its own motion. Thus, if Public Service's plan results in lower interest rates on its debt without a write-up of rate base, then the NHPUC may try to lower rates even if the plan itself does not contemplate any changes in rates. Such an attempt, if successful, could jeopardize the feasibility of a plan.

This Court has already noted the potential circularity in valuation. Valuation is based on revenues, which are derived from rates set by the NHPUC. Rates are based in part on capital structure, which is fixed under a plan approved by this Court. Capital structure is based in part on valuation, for value

determines distributions under a plan. The Bankruptcy Code, however, only requires that the appropriate regulatory agency approve any rate *change* proposed under a plan. 11 U.S.C. § 1129(a)(6). Nevertheless, a new capital structure may tempt the NHPUC to commence a new rate case, as noted above. Accordingly, any plan proposing changes in capital cost, rate base, or any of the other matters described above, must necessarily include some provision for regulation of Public Service or its successor on a non-traditional basis until such time as more traditional rate-making can be used without undoing the effects of confirmation of a plan and reorganization of the debtor.

Except in the context of an industry as heavily regulated as the utility industry, any suggestion that a state agency could nullify bankruptcy court approval of any of these transactions or interfere with the implementation of a plan would be ludicrous. *See Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); U.S. Const. Art. VI; 11 U.S.C. § 525. However, the NHPUC can be expected to assert here that a plan involving a sale of assets, a corporate restructuring, an issuance of new securities, or even the rejection of executory contracts for the purchase or sale of fuel or power presents a conflict between the jurisdictions of this Court and the NHPUC and that concurrent approval is required.

These issues are novel and complex, have no precedent, and must be fully analyzed from a financial, legal, practical, and strategic basis before meaningful negotiations toward a consensual plan can proceed. Public Service may be able to determine and argue successfully that this Court's jurisdiction is paramount in these circumstances or may be able to negotiate successfully with the NHPUC toward a consensual resolution of these difficult issues. Both require time. Public Service should be given that time in order to formulate a consensual plan. [See Court Document # 594, pp. 28–32]

The complexities of the case, in terms of circular questions and various uncertainties involved, is set forth in an excellent outline and summarization by the Creditors Committee in its memorandum (Court Document # 647). The included outline is as follows:

a. Seabrook—

i. what is the likelihood of all conditions to an operating license being fulfilled?

ii. in what time frame can a decision be expected as to full operations?

iii. in view of the likelihood that the United States Supreme Court will reverse the New Hampshire Supreme Court's affirmance of the anti-CWIP law, what increase in rates can be expected therefrom? *

iv. if Seabrook does not come on line as a result of actions taken in this Court, what claims may be asserted by the other joint owners against the Debtor?

v. how can the very substantial tax losses be utilized to maximize the return to creditors?

b. Internal reorganization—

i. what maximum increase in rates is feasible without adversely impacting demand?

ii. what structure can be established for rate setting such that the Bankruptcy Court and the Public Utilities Commission each have appropriate participation therein?

iii. what alternatives to historical costs can be utilized for rate making purposes, and what would be the rate results thereof?

iv. how can the estate be maximized by the rejection of disadvantageous executory contracts?

c. Separation of generation, transmission and distribution facilities—

i. how can this be accomplished in bankruptcy?

ii. what wholesale rates will the Federal Energy Regulatory Commission approve?

iii. what purchased power costs to the generating facility will become part of the rate base?

d. Sale of assets—

i. against what valuations of PSNH can bids properly be measured?

ii. can a bidding process be developed to prevent "bottom-fishing"?

iii. why will not bidders be restrained from offering "top dollar" by the very rate setting process which currently inhibits PSNH?

iv. will not bidders undermine the bankruptcy process by promising lower rates to the public in order to create ratepayer desire for a sale, which will necessarily depress the price to be paid for the operating assets?

---

* The Committee believes that the prospects are good that the U.S. Supreme Court will note probable jurisdiction and then reverse the ruling by the New Hampshire Supreme Court upholding the anti-CWIP statute. That necessarily must have a positive impact on the valuation of the Debtor and the return to creditors. [Foregoing, including fn. " *", appears in Court Document # 647, pp. 10–12]

The debtor in its reply memorandum (Court Document # 738) adds some additional questions relating to contingencies primarily involved at the Seabrook plant:

[I]f Seabrook is to remain part of Public Service after a reorganization, from where will the funds come to support it? If it is to be spun off, who will fund its continued operation pending licensing? If the funding is at a fixed dollar amount, will that be a signal to its opponents as to how long they need persevere before they succeed by time and not on the merits? If Seabrook funding is not adequate, will the other joint owners assert claims against either Public Service or the new Seabrook company? If those claims are asserted in the chapter 11 case, how will it affect distribution to unsecured creditors? If the claims are to be asserted only against the new Seabrook company, what assurance of feasibility can a plan provide without the funding necessary to carry Seabrook? Can Public Service's interest in the Seabrook Joint Owners Agreement be assigned to a new company? What assur-

ance of future performance can be provided? [13] [Court Document #738, pp. 20–21]

The debtor also made a showing that it has in fact engaged in analysis of various possible "plan scenarios" since the filing of the chapter 11 petition indicating diligent effort on the debtor's part to proceed toward plan formulation. As set forth in its initial memorandum these plan alternatives are four in number. (Court Document #594) The following extracts from the memorandum give a general reference to the alternatives being contemplated:

a. *Sale of Assets.*

Since the filing of the chapter 11 case, Public Service has received expressions of interest in the acquisition of its operating assets from two different New England utilities. Public Service believes that others may also be interested in acquiring Public Service or its operating assets. Accordingly, Public Service, with the assistance of its financial advisor, is preparing an orderly process for the possible sale of the company as a whole.

\* \* \* \* \* \*

b. *Internal Reorganization—Formation of a Holding Company.*

One of the principal causes of Public Service's financial difficulties has been the effect of New Hampshire's "anti-CWIP" statute, which excludes investment in construction work in progress from retail rate base until the construction is completed and the plan is operating and prohibits recovery of investment in cancelled or abandoned plants. N.H. Rev.Stat.Ann. § 378:30–a (1984); *Appeal of Public Service Company of New Hampshire,* 125 N.H. 46, 480 A.2d 20 (1984). Public Service has invested over $2 billion in Seabrook. This accounts for approximately 69% of the book value of the company's assets. Because most of Public Service's rates are subject to New

Hampshire regulatory jurisdiction, the anti-CWIP statute effectively prevents Public Service from recovering on its investment in Seabrook until the plant is operational.

In contrast, the Federal Energy Regulatory Commission ("FERC"), which exclusively regulates the sale of electric power for resale, permits a utility to include in its rate base a portion of its investment in construction work in progress and in abandoned or cancelled construction. A restructuring of Public Service's operations to provide for the sale of electricity at wholesale under FERC regulation could thus significantly increase Public Service's revenues and value.

\* \* \* \* \* \*

Before Public Service's chapter 11 filing, a maze of obstacles stood in the way of accomplishing such a restructuring. These obstacles included franchise restrictions and merger requirements imposed under New Hampshire law, time consuming regulatory procedures and burdensome standards established by the NHPUC, and other state and federal regulations. In contrast, chapter 11 may provide an opportunity for Public Service to avoid such obstacles to achieve a transfer, merger or consolidation by means of a confirmed plan of reorganization. *See, e.g.,* 11 U.S.C. § 1123(a)(5)(B), (C).

\* \* \* \* \* \*

c. *Internal Reorganization—NHPUC Regulation*

Public Service's underlying business of supplying electricity to nearly three-quarters of New Hampshire's population is sound. With its current corporate structure, NHPUC regulation, and current rates, Public Service can continue to operate and service some level of debt

**13.** It has been indicated at various hearings throughout this case that the other joint owners of the Seabrook nuclear plant might assert a claim of a magnitude in excess of $5 billion dollars against the debtor in the event that the plant does not ultimately go on line and has to be abandoned. The particulars of this possible

claim have never been made specific in the hearings before this court. The court is of the impression that no party wants to precipitate a definition of that hypothetical claim until and unless it becomes necessary in the proceedings. [See Transcript, Court Document #809, pp. 120–124]

and equity securities, although it is unlikely that this would provide maximum value to existing creditors and equity holders. Thus, an internal reorganization without formation of a holding company is likely a feasible, though probably undesirable, option.

However, favorable resolution of either of two outstanding issues could enable Public Service to increase its rates under its current corporate structure and NHPUC rate-making to a level that would provide a substantial return to parties in interest while providing reliable electric service to the citizens of New Hampshire. The two issues played central roles in prompting this chapter 11 case: the pending litigation over the "anti-CWIP" statute and the licensing of the Seabrook Nuclear Power Plant.

\*　　\*　　\*　　\*　　\*　　\*

d. *Liquidation.*

Piecemeal sales of portions of Public Service's assets to different buyers may also provide a basis for a plan. Sale of distribution assets to a utility with excess capacity, coupled with sales of generating facilities to local, regional, or foreign utilities that are short on capacity might generate more value than a sale of all operating assets to a single entity. Before its chapter 11 filing, obstacles similar to those hindering a corporate restructuring stood in the way of a liquidation. Public Service must evaluate this alternative, not only as an alternative to an integrated reorganization, but also to meet plan confirmation requirements. 11 U.S.C. §§ 1123(a)(5)(D), 1129(a)(7). [Court Document # 594, pp. 16–23]

Whether the foregoing showing made by the debtor constitutes the "cause" justifying the requested § 1121(d) exclusivity extension will be considered below. First, however, the relevant statutory provision and case law pertaining thereto needs to be discussed.

## THE STATUTORY STANDARD

The provisions of § 1121 of the Bankruptcy Code, and their effect in chapter 11

reorganization proceedings, is well-summarized by the district court in *In re Perkins*, 71 B.R. 294 (W.D.Tenn.1987), as follows:

The statute provides that "only the debtor may file a plan [of reorganization during the first] 120 days after the date of the order of relief under this chapter." 11 U.S.C. § 1121(b). Competing plans may be filed by an interested party if and only if—

(1) a trustee has been appointed under this chapter

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

11 U.S.C. § 1121(c). The 120 and 180 day periods referred to in § 1121(c) may be increased or decreased by the court for cause upon a request made "within the respective periods." 11 U.S.C. § 1121(d). The effect of § 1121 is to give the debtor the exclusive right during a limited period to present the creditor body with a proposed plan of reorganization. Once the exclusivity period ends, competing plans may be proposed.

The district court in *Matter of Lake In The Woods*, 10 B.R. 338, 340, 345 (E.D. Mich.1981), succinctly summarizes the statutory context and legislative intent underlying § 1121 of the Bankruptcy Code as follows:

The scope of a plan of reorganization may vary widely under Chapter 11, although certain provisions are mandatory. Among other requirements the plan must contain specific classifications for each claim or interest a debtor bears, a description of the treatment to be afforded the various classifications and the means by which the proponent intends to execute the plan. The terms of the plan itself are necessarily a product of negotiation between the debtor and those with outstanding claims or interests, and Chapter 11 is drafted to afford maximum

flexibility to the parties in the structuring of a plan of reorganization. As the legislative history of Chapter 11 notes:

> The bill does not impose a rigid financial rule for the plan. The parties are left to their own to negotiate a fair settlement. The question of whether creditors are entitled to the going-concern or liquidation value of the business is impossible to answer. It is unrealistic to assume that the bill could or even should attempt to answer that question. Instead, negotiation among the parties after full disclosure will govern how the value of the reorganizing company will be distributed among creditors and stockholders.

> \*  \*  \*  \*  \*  \*

Section 1121 of the new Code, which allows both debtors and creditors to file plans of reorganization after an initial 120–period, represents the legislative solution to the problems created by Chapter XI's exclusive filing provision, and by Chapter X's inflexibility. Under Chapter 11 the debtor is not automatically required to turn its operation over to a trustee, nor is it permitted to retain control of the enterprise until an unwilling creditor agrees to accept a proposed plan of reorganization.

As has already been indicated, § 1121(d) provides a "for cause" standard in determining exclusivity extension requests. As might be inferred from such a general standard, the legislative intent has been construed to leave the question to the reorganization court in the exercise of its discretion and to promote maximum flexibility to suit various types of reorganization proceedings. *See* 5 *Collier on Bankruptcy* ¶ 1121.04 at 1121–11 to 1121–13 (15th ed. 1979).

The § 1121(d) standard has been applied in a number of recent cases with mixed results for the debtors involved. *See, e.g., In re Texaco, Inc.,* 76 B.R. 322 (Bankr.S.D.N.Y.1987) (Extension of 120 days granted —initial request); *In re Perkins,* 71 B.R. 294 (W.D.Tenn.1987) (Extension of confirmation exclusivity granted—plan already filed); *In re Pine Run Trust, Inc.,* 67 B.R.

432 (Bankr.E.D.Pa.1986) (Extension of 100 days granted—second request); *In re United Press International, Inc.,* 60 B.R. 265 (Bankr.D.C.1986) (Extension of confirmation exclusivity granted—plan already filed); *In re Tony Downs Foods Company,* 34 B.R. 405 (Bankr.Minn.1983) (Extension denied—initial request); *Matter of American Federation of T.V. Artists,* 30 B.R. 772 (Bankr.S.D.N.Y.1983) (Extension denied—initial request), *appeal filed on other grounds; In re Ravenna Industries, Inc.,* 20 B.R. 886 (Bankr.N.D.Ohio 1982) (Extension denied—15 months from filing); *Matter of Lake In The Woods,* 10 B.R. 338 (E.D.Mich.1981) (Extension denied—18 months from filing). *See also, In re Manville Forest Products Corp.,* 31 B.R. 991, 993 (S.D.N.Y.1983) (extensions must be "paid for" by "hard bargaining").

The legislative history behind the enactment of § 1121 of the Code, as part of the Bankruptcy Reform Act of 1978, is set forth in some detail in the report by the House of Representatives that eventually became the law:

> Chapters X and XI of current law permit different entities to propose plans of reorganization. Under chapter X, because an independent trustee has been appointed, the debtor has lost control of the business, and the financial standard rules restrict the possibilities for negotiation in the formulation of a plan, any party in interest, including the trustee, creditors, and the debtor, may propose a plan. This feature has been heavily disfavored by debtors when choosing a reorganization chapter, because they lose control over the future of the enterprise.

> By contrast, chapter XI gives the debtor the exclusive right to propose a plan. Creditors are excluded. The exclusive right gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors, and they have little recourse except to move for conversion of the case to chapter X. That is contrary to their interests as it is to the debtor's, and thus is rarely done. The debtor is in full

control, often to the unfair disadvantage of creditors.

Proposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy. At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company. The bill gives the debtor an exclusive right to propose a plan for 120 days. In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120–day period depending on the circumstances of the case. For example, if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement. If, on the other hand, a debtor delayed in arriving at an agreement, the court could shorten the period and permit creditors to formulate and propose a reorganization plan. Again, the bill allows the flexibility for individual cases that is unavailable today.

[Report of the Committee on the Judiciary, House of Representatives, to accompany H.R. 8200, H.R.Rep. No. 95–595, 95th Cong., 1st Sess., pp. 231–32 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6191.]

The report of the United States Senate on essentially the same legislative proposal added the following comment:

Subsection (d) permits the court, for cause, to increase or reduce the 120–day and 180–day periods specified. Since, the debtor has an exclusive privilege for 6 months [120 days in final bill] during which others may not file a plan, the granted extension should be based on a showing of some promise of probable success. An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.

[Report of the Committee on the Judiciary, United States Senate, to accompany S.2266, S.Rep. No. 95–989, 95th Cong., 2d Sess., p. 118 (1978), U.S.Code Cong. & Admin.News 1978, p. 5904.]

The court in *In re Tony Downs Food Company, supra,* made reference to the intended tension among the parties that lies at the heart of the § 1121 structure:

Congress has attempted through various provisions of the Bankruptcy Code to balance the rights and obligations of a Chapter 11 debtor in possession and its creditors, thus creating a tension among interested parties which will hopefully lead to appropriate administration of and a successful conclusion to the Chapter 11 case. Section 1121 is one of the important sections intended by Congress to create such tension. The debtor is given a 120–day breathing spell in which it exclusively can file a plan. However, at the expiration of the 120 days, any party in interest can file a plan. I think that Congress attempted to strike a careful balance in this section which was intended to put a certain amount of pressure on the debtor. While Congress has given the Bankruptcy Court the authority to extend or shorten the time, I see nothing special in this case to alter the Congressional policy nor any cause to increase the time as requested by the debtor. The debtor argued at the hearing that it needed more time in order to develop its plan. Section 1121 does not create a deadline for filing a plan; the debtor is free to take as much time to develop and file its plan as it feels appropriate. The risk is, of course, that while it is developing its plan, another party in interest will file a plan. However, that is as Congress intended.

*In re Tony Downs Foods Co.,* 34 B.R. 405, 407–408 (Bankr.Minn.1983).

The court in *In re Perkins, supra,* noted that the debtor's exclusivity period, with regard to confirmation of plan, can be considered more leniently than extensions of exclusivity when a plan has not yet been filed:

This court is of the opinion that an extension of the exclusive time in which to file a plan presents an enhanced potential for skewing the bargaining balance in favor of the debtor, contrary to the intent of the legislature. If no plan is filed, the creditor body has no information upon which to formulate either a positive or negative opinion. On the other hand, if the debtor has filed a plan; potential for upsetting the bargaining balance is more remote. No longer in the dark with respect to the debtor's intentions, the creditors have a basis for decision, and can either accept the plan or fight extensions to the exclusivity period, in order to file a competing plan. Therefore, extensions of the exclusivity period for gaining acceptances do not have the potential for detrimental impact upon the creditor's bargaining position occurring where no plan has been filed. Accordingly, cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan.

*In re Perkins,* 71 B.R. 294, 299 (W.D.Tenn. 1987).

More recently the Court of Appeals for the Fifth Circuit, in *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363 (5th Cir.1987), *aff'd,* —— U.S. ——, 108 S.Ct. 626, 98 L.Ed. 740 (1988), expressed itself with regard to the proper construction of § 1121 of the Bankruptcy Code:

Finally, we note that Congress, in 1978, expressly recognized the problems faced by creditors of a debtor who unreasonably delays in proposing a plan of reorganization. In § 1121 of the Bankruptcy Code, Congress gave the debtor a period of 120 days, after the commencement of the Chapter 11 case, during which the debtor has the exclusive right to file a plan of reorganization. Thereafter, if the debtor has not filed a plan, any party in interest, including any creditor, may file a plan. The 120–day period may be reduced or increased for cause, on request of a party in interest, after notice and a hearing.

The limited exclusivity period which is a feature of Chapter 11 proceedings under the Bankruptcy Code contrasts with the procedure under Chapter XI of the Bankruptcy Act which gave the debtor the exclusive right, throughout the Chapter XI proceedings, to propose a plan. The House Report accompanying H.R. 8200 noted that "[t]he exclusive right [under old Chapter XI] gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors." *House Report, supra,* at 231, U.S.Code Cong. & Admin.News 1978, p. 6191. Additionally, § 1121 represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise.... we think that any bankruptcy court involved in an assessment of whether "cause" exists should be mindful of the legislative goal behind § 1121. The bankruptcy court must avoid reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old Chapter XI. Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.

*In re Timbers, supra,* at 372. The decision of the Fifth Circuit in the *Timbers* case, which denied a right to interest payments as adequate protection to an undersecured creditor delayed from foreclosure by the reorganization, was affirmed by the United States Supreme Court on January 20, 1988.

The bankruptcy court, in *In re Pine Run Trust, Inc.,* 67 B.R. 432, 434–35 (Bankr.E. D.Pa.1986), noted that a balance had to be struck between "the need for the debtor to remain in control to some degree" and "the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company." The court also noted as an element of cause for an exclusivity extension "....Some promise of probable success in formulating a plan of reorganization...." *Id.,* at 435.

Finally, it must be recognized in applying the statutory standard that some delay for

senior classes in realizing their rights may be justified by the attempt in reorganization to realize the maximum value out of the entity in the reorganization. Reasonable delay to foster a successful reorganization in that sense, even at the temporary expense of senior classes, is an integral part of the reorganizational progress in the federal courts. *Wright v. Union Central Life Ins. Co.,* 304 U.S. 502, 515–18, 58 S.Ct. 1025, 1032–34, 82 L.Ed. 1490 (1938); *Wright v. Vinton Branch,* 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736 (1937); *Continential Illinois Nat'l Bank v. Chicago, R.I. and P. Railway,* 294 U.S. 648, 680–81, 685, 55 S.Ct. 595, 608, 610, 79 L.Ed. 1110 (1935); *see also,* 2 *Collier on Bankruptcy* ¶ 362.01 at 362–13 to 362–18 (15th ed. 1987).

■ It seems clear from a review of the relevant authorities that size and complexity alone cannot suffice as "cause" for a continuation of a debtor's plan exclusivity right in a chapter 11 reorganization. If that were so, a debtor in a case such as the present would automatically have a right to plan exclusivity throughout the proceedings—contrary to the "balancing" and "tension" rationale underlying § 1121 as detailed above. It does stand to reason that a debtor in a large and complex case may make a showing of cause on those facts for exclusivity extension in the *initial stages* of the reorganization by virtue of that factor. *Cf. In re Texaco Inc., supra,* 76 B.R. at 327. The court in *Texaco* gave an initial 120–day extension and ultimately extended plan exclusivity for a total period of approximately nine months following the commencement of the case before the debtor's plan of reorganization was filed. *See In re Texaco Inc.,* 81 B.R. 806, 807–808 (Bankr.S.D.N.Y.1988). If size and complexity *alone* were sufficient cause, that interpretation of the statutory standard would in effect eat up the rule.

■ The court concludes that an appropriate interpretation of the "for cause" lan-guage of § 1121(d) would provide that size and complexity must be accompanied by other factors pertinent to the particular debtor and its reorganization to justify extension of plan exclusivity, except perhaps in the very early, initial stages of the chapter 11 proceeding. Such factors include those developed in the cases, i.e., the likelihood of an imminent consensual plan if the debtor retains control, no alternate substantial plan being held off by debtor exclusivity, and the general balancing analysis to avoid allowing the debtor to hold the creditors and other parties in interest "hostage" so that the debtor can force its view of an appropriate plan upon the other parties.

## APPLICATION OF STATUTORY STANDARD TO PRESENT CASE

■ The Third Mortgage Bond Holders and the debtor come up with diametrically-opposed reactions to the showing of complexity and uncertainties relating to.a plan of reorganization in this case. The Third Mortgage Bond Holders note the uncontroverted fact that all such uncertainties will clearly not be resolved by the expiration of the eight-month extension request.[14] Therefore, the Third Mortgage Bond Holders contend that the court should open up the process of competing plans now rather than being forced to such an inevitable conclusion at the expiration of the requested plan exclusivity extension.

The debtor and its supporters argue to the contrary that, while all uncertainties will not be resolved by January of 1989, some matters will be determined and other uncertainties will have "boxed around them" a more definite and meaningful range of possible results and thereby foster a better understanding of the factors involved.[15] On balance the court is left with the impression that the debtor does not realistically see itself filing a plan of reorganization by January of 1989, but rather will request a further extension un-

---

**14.** Debtor's witnesses Dietz and Rossi in effect conceded that no plan *per se* is likely by January of 1989. [Transcript, Court Document #809, pp. 67–69, 131–32]

**15.** Testimony of debtor witness Dietz. [Transcript, Court Document #809, p. 63]

til the various contingencies are further resolved.

I agree with the debtor to the extent that the Third Mortgage Bond Holders' position is essentially an implicit non sequitur, in that they are seeking to have the court rule that since the various contingencies will not be resolved within eight months the debtor should be directed to formulate and file a plan within two months. It seems to me that with the legions of sophisticated reorganization attorneys, accountants, and investment bankers already engaged in this reorganization effort it need not be concluded that it is beyond the pale of human achievement to negotiate an appropriate plan of reorganization within some limited extension of the exclusive period beyond that presently granted.

As noted above, the debtor and its financial advisor have accomplished the necessary computerized model to permit serious negotiations to go forward on various plan alternatives. The debtor has also assured the court that all qualified negotiating parties will have full access to that computerized information. In effect the base model computer program serves as the "talking piece" for plan negotiations that were employed in an earlier age. (Transcript of PSNH hearing, May 19, 1988, Court Document # 809, pp. 100, 108–127, 119–121, and 133–137) The characteristics and usefulness of the computer program were further detailed in a May 20, 1988 hearing, regarding the appointment of a financial advisor for the equity committee, at which all parties were also present. (Transcript, Court Document # 813, pp. 32–36)

The professionals, both legal and financial, engaged in this reorganization effort are all consummate professionals and should be able to devise a plan of reorganization which "works around" any remaining unresolved factors or uncertainties. The creative resolution of any uncertainties that cannot be finessed in that sense may require some innovative procedures suitable only to a case of this nature. However, there are indications that such thinking is in process as evidenced in this record. (Transcript, Court Document # 809, pp.

117–118; Memorandum, Court Document # 738, pp. 5–6; Memorandum, Court Document # 647, pp. 26–28) It should also be possible for experienced reorganization professionals to devise—for those variables or uncertainties that cannot be adequately quantified within a reasonable time—appropriate "after-shock mechanisms" in the plan itself, together with "expandable" financial devices, such as warrants or participation certificates, income bonds, zero-coupon bonds or preferred stock, that can appropriately take into account such variables. *See* Roe, *Bankruptcy And Debt: A New Model For Corporate Reorganization*, 83 Columbia Law Rev. 527, 592–93 (1983); Flaschen & Reilly, *supra*, at 999–1001; Eisenberg, *supra*, at 40–41, 48–50. *Cf. also*, Bebchuk, *A New Approach To Corporate Reorganizations*, 101 Harvard Law Rev. 775 (February 1988). Such flexible mechanisms and financial devices could be especially appropriate in the reorganization of a utility company.

Accordingly, I find and conclude that the debtor has shown cause within the meaning of § 1121(d) of the Code for some further extension of the plan exclusivity period. I do believe that it is not beyond reason to expect that an appropriate plan could be filed before the end of this year by the debtor and, accordingly, I reject the argument of the Third Mortgage Bond Holders that because an extension would be fruitless in producing a plan the exclusivity period should be cut off now.

### THE "CHAOS" OR "FREE FALL" CAVEAT

Since I have found cause for a further extension of plan exclusivity, it is perhaps unnecessary at this stage to deal with the debtor's *leitmotif* argument throughout its pleadings and oral argument to the effect that a dire fate awaits this court and the various parties in interest if a denial of further plan exclusivity results in the filing of multiple plans of reorganization in this proceeding. The debtor contends that multiple plans result in "chaos" or a "free fall" into chaos—on the basis of past experience in some chapter 11 cases.

This court believes that this danger is more of a myth than a demonstrated fact from specific cases—or, more accurately, it is a danger that can be adequately controlled by appropriate use of a bankruptcy court's powers with regard to a reorganization pending before it. The debtor's position in this regard again would eat up the rule if literally followed.[16]

There is no reason to assume that the reorganization court cannot control that process in a sensible manner. *Cf. In re United Press International Inc.,* 60 B.R. 265, 271, fn. 12 (Bankr.D.C.1986).[17]

This court, in the present case, queried the parties in that regard in the Procedural Order dated April 29, 1988, which appears in the appendix to this opinion:

> To the extent that refusal by the court to extend the statutorily-prescribed exclusivity period for the debtor might result in multiple plan filings, what discretion if any would this court have to hold back submission of multiple plans until they were merged into a consensual plan, or until it be determined that each plan had been improved by competition to the maximum benefit of all constituencies involved? Cf., *In re Harcom, Inc.,* 79 B.R. 137 (Bankr.N.H.1987). Would not the asserted strong legislative policy fostering consensual plans in chapter 11 justify delaying submission of multiple plans un-

til it becomes apparent that there is no reasonable likelihood of negotiating one, consolidated consensual plan?

In the court's judgment no substantial answer to that question was presented by the parties, in their pleadings or in oral argument, that negated the implicit power of this court to employ reasonable means to facilitate a consensual plan of reorganization if at all possible.

To deny that power would be in effect to "skew the balance" in favor of the debtor under § 1121(d) in complex cases for the reasons indicated above. The Creditors Committee did indicate that such activity by the court might be considered as inappropriate "pre-selection" of a plan, contrary to the terms and spirit of the 1978 Code. That response misconstrues the concept intended; there would be no selection whatsoever by the court as to an ultimate plan, but simply the exercise of discretion in delaying submission of one or more plans to the parties in interest for voting until any reasonable prospect for merging those plans into one consensual plan has expired. Analogous imaginative exercises of a reorganization court's power with regard to exclusivity extensions appears in the history of prior complex chapter 11 proceedings.[18]

If in fact it is a "strong policy" underlying chapter 11 of the Bankruptcy Code to

---

**16.** If taken literally, the debtor's position would mean that the debtor must have the sole power to present a plan, because multiple plans will bring chaos; therefore, the debtor's exclusivity period must be continued indefinitely. *See also,* general discussion in Rosen & Rodriguez, *Section 1121 and Non-Debtor Plans of Reorganization,* 56 Am. Bk'y Law Journal 349 (1982).

**17.** The bankruptcy judge in *United Press* commented as follows:

> Thus, this Court adopted a middle approach, initially suggested by the parties themselves—opening up the right to file a plan on a limited basis to those two entities (besides the Debtor itself) that have the most at stake in this case and have shown themselves to be responsible parties, while refraining from opening the floodgates completely. The statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication. *In re United Press Intern., Inc.,* 60 B.R. 265 (Bankr.D.C.1986).

**18.** *See, e.g., In re Texaco Inc.,* No. 87–B–20142, Order under § 1121(d) entered December 8, 1987, attached as Exhibit A to Court Document #740 in the present record (Bankr.S.D.N.Y. 1987) (second extension granted, but with caveat that exclusive periods would be modified if certain major constituencies agreed on a plan); *In re Perkins,* 71 B.R. 294, 295–96 (W.D.Tenn. 1987) (exclusivity extensions more easily granted when plan already filed); *In re A.H. Robins Co., Inc.,* No. 85–1307–R, Order under § 1121(d) entered February 4, 1987, attached as Exhibit B to Court Document #739 in the present record (Bankr.E.D.Va.1987) (exclusivity extended "until further order of the Court"); *In re United Press Intern., Inc.,* 60 B.R. 265, 271, n. 12 (Bankr.D.C. 1986) (consent order gave creditors' committee right to file plan under certain conditions within initial exclusivity period; employees' union granted similar right in first order extending exclusivity period).

foster consensual plans, as the debtor and the committees here argue, and as the cases hold, then it appears to this court at least that that strong policy does not simply evaporate when it is determined in a particular case that the period of debtor plan exclusivity should end. Moreover, it perhaps needs to be remembered that ending plan exclusivity does not by itself mean that multiple plans *will* be filed, or that the parties may not *still* agree to a consensual debtor plan. It simply returns the parties to a level playing field after the period of debtor control intended by Congress has expired.

## CONCLUSION

A useful "battle of aphorisms" regarding the pending matter appears in the debtor's memorandum, i.e., "unresolved issues require extensions", and in the Third Mortgage Bond Holder's memorandum, i.e., "deadlines facilitate resolutions." (Court Documents # 594 and # 719, at pp. 13 and 6, respectively) Another factor that should be borne in mind—although not a pithy aphorism—is some reference to the extremely high administrative cost of these reorganization proceedings. On a conservative basis, based upon the figures noted above, the "per diem" cost of these proceedings in the total functional sense is somewhere in the vicinity of $350,000 per day. That number is "pithy" enough to suggest avoidance of all unnecessary delay in reaching a plan of reorganization.[19]

**19.** I realize that an argument can be made, and has been made, that delay in the reorganization of a troubled utility company is not necessarily an evil in terms of realizing maximum value for the lower ranks of interests. *See* Eisenberg, *supra*, at pp. 33–36. Of course the lowest interests in danger of being wiped out always have a "risk everything" motivation to realize top values. *See*, Belchuk, *supra*, at pp. 777–781. That may mean however in a particular case that the lower ranks just want to "risk other people's money." The reorganization court always has to strike an appropriate balance between the risk of delay and the prospect of possible gain in these matters.

**20.** The court takes no position as to whether economically a reorganization plan incorporating an operating Seabrook plant, as part of the reorganized company, is in fact the best choice in the ultimate plan to be negotiated by the

Delay is not only costly in terms of administrative expense but it could also be damaging to the prospects of realizing the intrinsic economic value of the Seabrook nuclear plant.[20] The problems presently besetting the Seabrook nuclear plant are basically related to safety and environmental concerns, which will ultimately be resolved by the appropriate federal and state agencies. As indicated, Seabrook already has its 40–year operating license from the NRC and that agency normally does not consider financial stability of the utility entity before allowing the plant to finally go on line. The NRC usually defers to the state and federal rate-setting regulatory agencies in that regard. However, the court earlier in these proceedings heard a NRC representative, Edwin J. Reis, Esquire, Deputy Assistant Counsel, at a PSNH general hearing on March 11, 1988, with relevant comments in that regard. (Court Document # 421, pp. 126–129) Mr. Reis stated:

My major concern here of course is not financial, it is to preserve the jurisdiction of the NRC and to call the Court's attention to the Atomic Energy Act of 1954 [42 U.S.C. §§ 2011 et seq.] particularly Sections 182 and 184 [42 U.S.C. §§ 2232, 2234 respectively]. One eighty-two among other things requires that we pass upon the financial qualifications of a utility that applies for a license from us. One eighty-four among other things

parties. The answer to that question involves complex questions regarding rates, rate structure, and allocation of the cost of the plant. A net operating tax loss carry-forward of approximately $2.0 billion, in the event of abandonment of the plant, which could shield the reorganized company from taxes for a considerable period, must also be factored into the equation. [Transcript, Court Document # 813, pp. 37–38; Gilbert, *supra*, at p. 152] The allocation of the costs of an abandoned plant between shareholders and creditors—or the reverse allocation of gain in the sale of appreciated utility assets—present other complex questions to be resolved in the plan. *See* Eisenberg, *supra*, at pp. 8 (fn. 20), 37–40, 45–51. But regardless of the ultimate answer to all these questions in a negotiated plan, or in litigation, it behooves no constituency involved in this case to allow Seabrook to be prematurely lost by default.

prevents any involuntary transfer, any voluntary or involuntary transfer of any license given by the NRC.

The Seabrook facility itself is such a license. It is a utilization facility and therefore to use it or to possess it whether it be by a trustee. Right now the Debtor is in possession, but if it should be another trustee we would have to look at the qualifications of that trustee and be assured that the public health and safety was protected just from radiological risks. That is our charter and that is what we look at.

In looking at radiological risk, we also look at some things that will impact the interest of this Court. That, for instance, that competent engineers are hired, that equipment is maintained, that quality of equipment is bought as replacements are needed and that sort of thing. We also require financial protection against accidents, funds to deal with accidents for the property. We are about to adopt a rule on decommissioning whereby some kind of a fund, though it isn't clear what, will have to be set for for decommissioning of facilities and those sorts of things.

\* \* \* \* \* \*

I would like to also point out that we have a rule in the NRC that generally provides that public utilities, they don't have to show their financial qualifications before the NRC because it is presumed their financial qualifications will be satisfied in rate-making, that they will get the money for the engineers, for the quality equipment that I talked about in rate-making.

Here there is a question that is here and I don't have any answer as to where is the authority over rates? And we are concerned about that and we are looking at that and following this proceeding from that point of view. Secondly, there is a petition before the NRC that says

the NRC should discontinue giving its licenses or discontinue considering an operating license for the Seabrook facility because this very proceeding has been filed.

It therefore appears questionable whether the NRC will be able to maintain its normal posture indefinitely if the reorganization process regarding PSNH does not present the prospect of a financially stable entity to take over the long-term responsibility of a nuclear power plant operation when and if Seabrook is otherwise ready to go on line.[21]

From the entire record before me it would appear that there is a "window of opportunity" of approximately six months in which a relatively painless reorganization plan might be negotiated on a consensual basis. While the questions are complex and many, the professionals approved by the court in this case should be able to do the job. As for the timing of the extension date I also take into account the quadrennial event scheduled to occur on November 8, 1988.

■ While the court does not "follow the election returns" normally, it is somewhat relevant that the Governor of Massachusetts, who has opposed as unfeasible any evacuation plan for Seabrook, and the Vice–President of the United States, who has supported the completion and the licensing of the Seabrook plant, appear to be the likely nominees of their respective parties in the presidential election to be held on that date. To the extent that one or the other may be influential as President in speeding up or delaying the prospects for the Seabrook Plant coming on line, and thus producing or denying substantial new revenues for this debtor, it does appear appropriate as the Creditors Committee suggested that any extension of plan exclusivity be to a date after the results of that election are known.

---

21. Other possibilities as to the "unraveling" of the Seabrook option involve the financial strength of the other joint owners and their ability to cover the maintenance and preservation costs of the plant as time goes on. Recent press reports indicate incipient withdrawal activity by two of the participants. *See* Article, "Seabrook Partner Ends Upkeep Outlays, Seeks Buyer For Stake In Nuclear Plant," *Wall Street Journal,* June 2, 1988, p. 6; *see also* Article, "New England Power Takes Loss On Seabrook," *Boston Globe,* June 4, 1988, p. 35.

■ After consideration of all of the foregoing factors impinging upon an exclusivity extension determination in this rather unusual chapter 11 proceeding, I conclude that a further extension of the debtor's plan exclusivity until December 27, 1988 is appropriate and justified under the "for cause" standard in this case, even though such a seven-month extension is rare in chapter 11 proceedings. I do so on the basis that a lengthy extension of that nature will give the debtor the necessary time free from distraction to get the job done.[22] A separate supplemental order extending exclusivity for a plan to December 27, 1988 will be entered contemporaneously with the release of this Memorandum Opinion.

I have written at unusual length in reaching this decision in order that the debtor and all other parties will have full advance notice as to my reading of the appropriate factors justifying extensions of plan exclusivity for a debtor in a chapter 11 proceeding. I do not now rule that a further extension of plan exclusivity will not be granted. I will have to react to the situation then presented if a further request is made. But the debtor is forewarned that it will have the full burden for showing cause for further extension beyond the self-evident size and complexity of the case.

It will not do to justify any further exclusivity extension request by providing generalized references to on-going "negotiations" which might result in a consensual plan. At a bare minimum any such request will have to address specifically the factors set forth in this opinion, and will have to be accompanied by a definitive "action plan" which details the debtor's realistic prospects for reaching a consensual plan within a definite period.[23]

In sum, the court considers it important that the debtor, as well as all other parties in interest in this case, understand that "waiting around to see what happens to Seabrook" is not a sufficient explanation for non-results by professionals paid at the compensation levels authorized by this court's orders regarding said professionals. If the response is to be "we can't get there from here" we probably can find professionals at much lower rates who can also tell us that. Or, alternatively, opening up the plan process to competing plans may well be the way to break up such an impasse.

APPENDIX

ANNEX A

PROCEDURAL ORDER

The debtor on April 28, 1988 having filed its Motion To Extend Plan Exclusivity Periods and having set the same for hearing on May 20, 1988 pursuant to this court's Amended Orders entered April 19, 1988 regarding standard notice and motion hear-

---

22. At the conclusion of the May 19th hearing I indicated some concern and anticipation as to issues that could be raised as to access to the necessary data by qualified negotiating parties. I then indicated that I would probably have an "interim hearing" during the period of any extension to review the access question. However, as the debtor points out, no party has claimed any denial of access and I recede from that position. If access problems should develop, it suffices that such parties have the mechanism of the regular Friday hearings to air their complaints.

23. While a good bit of the court's commentary in this opinion deals with the duty of the debtor to move full speed forward and take full advantage of its exclusivity period, it should be observed that it also will not do for the State of New Hampshire to simply sit by passively waiting for the debtor to create such a plan out of thin air. The state must realize that unresolved questions as to that portion of the cost of the Seabrook plant determined to be prudent and entitled to enter into the ratebase of the debtor, and the essential economic question as to the maximum "bearable" rates New Hampshire electric consumers can pay, are questions in which the state as well as the debtor must soon "bite the bullet" in pragmatic terms if this reorganization is not to go into a downward spiral of circular questions and litigation which will prevent a timely resolution "before the patient dies." This court stands ready, either directly or through appointment of an examiner or other expert under the Bankruptcy Code or the Federal Rules, to engage with the professionals in this estate and the appropriate state officials in whatever single, combined, or dual process that may be required to speedily determine those matters.

ing procedures for this case; and the court having reserved its discretion in said orders to override their provisions with regard to particular matters if warranted by various circumstances; and the court noting that a number of other motions are already scheduled at the regular periodic hearing date on May 20, 1988, that the subject motion may require further time and will be available on that date, and in order to permit a full and complete hearing thereon, it is accordingly

ORDERED, ADJUDGED and DECREED as follows:

1. The Motion To Extend Plan Exclusivity Periods filed herein by the debtor on April 28, 1988 is hereby set down for hearing at *9:30 a.m. on Thursday, May 19, 1988,* in the United States Bankruptcy Court, 7th Floor, 275 Chestnut Street, Manchester, New Hampshire, 03101, notwithstanding any prior notice given pursuant to the standard notice and motion procedure orders.

2. General counsel for the debtor is directed to have available to testify at the hearing a key executive officer of the debtor with whom counsel customarily consults as to plan formulation matters. Counsel shall also arrange to have available a knowledgeable individual from the debtor's appointed financial advisor to give the court some indication of the advisor's activity to date and timetable for future activity.

3. The response deadline is changed to *May 12, 1988.* The reply deadline for the debtor is changed to *May 17, 1988.* All other provisions of the Amended Orders entered April 19, 1988 remain unchanged.

4. In its reply pleading and memorandum, to be filed by May 17, 1988, the debtor should include among any other matters set forth a discussion of the following specific questions:

a. Assuming for purposes of argument that it is established at the hearing that more time is required for negotiation of a consensual plan, and that the fostering of consensual plans is an important factor and goal in the underlying rationale of the chapter 11 provisions of the 1978 Bankruptcy Code, what legal or practical considerations indicate that a consensual plan may not still be negotiated just because the debtor no longer has the exclusive right to put forward a plan in the proceedings?

b. To what extent can or should the court consider as a factor in a § 1121 extension decision the fact, if it is established at the scheduled hearing, that there exist outside parties (third party suitors) seeking to merge or acquire the debtor and/or some or all of the debtor's assets in conjunction with a plan of reorganization? Would not opening up the process to "competitive bidding" by allowing competing plans to be filed possibly enhance reorganization values (and an earlier realization of same) with such competition resulting in constant improvement of competing plans to realize the highest possible reorganization value?

c. To what extent, if at all, does the recent experience in resolving competing plan proposals in the large complex reorganizations in the *Texaco, Inc.* case in the Southern District of New York and the *A.H. Robbins Co.* case in the Eastern District of Virginia throw any useful light upon the preceding question?

d. What citations can be supplied with regard to the first full sentence on page nine of the debtor's memorandum filed April 28, 1988?

e. To the extent that refusal by the court to extend the statutorily-prescribed exclusivity period for the debtor might result in multiple plan filings, what discretion if any would this court have to hold back submission of multiple plans until they were merged into a consensual plan, or until it be determined that each plans had been improved by competition to the maximum benefit of all constituencies involved? Cf., *In re Harcom, Inc.,* 79 B.R. 137 (Bankr.N.H.1987). Would not the asserted strong legis-

lative policy fostering consensual plans in chapter 11 justify delaying submission of multiple plans until it becomes apparent that there is no reasonable likelihood of negotiating one, consolidated consensual plan?

f. To the extent that obstacles to a present plan exist by virtue of uncertainties relating pending litigation (set forth in pp. 19–22 of Debtor's Memorandum) would not opening up the process to imaginative alternative plan proposals (some of which might not be within the debtor's power) perhaps permit "working around" those obstacles (a device not unknown in reorganization law) and thus speed up the entire process to the benefit of all constituencies?

The foregoing submission of questions to be briefed prior to the hearing *should not be taken by any party as an indication of a present position by the court* on any matter involved. The court has adopted this procedure due to the imminent expiration of the 120–day exclusive period under § 1121 shortly after the hearing, and to avoid undue delay to the extent that these questions *if determined to have weight in a § 1121 extension decision* might not be covered in the briefing.

DONE and ORDERED this 29th day of April, 1988 at Manchester, New Hampshire.

### ANNEX B

### PRELIMINARY ORDER ON PLAN EXCLUSIVITY EXTENSION

On April 28, 1988 the debtor filed its Motion To Extend Plan Exclusivity Period seeking to extend the 120–day and 180–day exclusivity periods prescribed by § 1121 of the Bankruptcy Code from their present expirations on May 27, 1988 and July 26, 1988 to January 27, 1989.

Following requisite notice an all-day hearing on the motion was held before the court on May 19, 1988, to determine whether the debtor could show "cause" for an extension of the statutorily-prescribed ex-

clusivity period pursuant to § 1121(d) of the Code.

At the conclusion of the hearing, in view of the imminent expiration of the exclusivity period, the court dictated into the record its findings and conclusions to the effect that the debtor had shown cause for at least a 120–day extension. [See Annex to this Order] The court hereby incorporates by reference said findings and conclusions.

The court will determine by supplemental order, to be entered in conjunction with ruling on pending motions for intervention or § 1109 status determinations by various entities in this case, such further extension of the exclusivity period which may be justified by a review of the record of the May 19, 1988 hearing after the transcript of that hearing has been filed. Accordingly, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

1. The exclusive period within which the debtor alone may file a plan of reorganization in this case pursuant to § 1121(b) of the Bankruptcy Code is hereby extended to September 26, 1988.

2. If the debtor files a plan on or before September 26, 1988, the further exclusivity period to secure acceptance of the plan pursuant to § 1121(c)(3) of the Bankruptcy Code is hereby extended to November 25, 1988.

3. The court reserves its jurisdiction and will enter a supplemental order granting or denying any further extension of exclusivity after review of the record of the May 19, 1988 hearing as indicated above.

DONE and ORDERED this 26th day of May, 1988 at Manchester, New Hampshire.

### ANNEX C

### EXTRACT FROM CONCLUSION OF HEARING ON MAY 19, 1988 ON MOTION FOR EXTENSION OF EXCLUSIVE PERIOD

[Comments of Judge Yacos]

I'll state some conclusions that I have at this point, which will partially determine the matter before me. The Order will be

entered in more precise terms and, as you'll see, I haven't come to a final conclusion as to all aspects.

But one thing seems to me reasonably clear in this matter and that is that the debtor is entitled to at least a four month extension for the simple reason that the first 120 days of this proceeding has been used in connection with extraordinary organizational matters necessary in a rather unique case. All of the committees have only recently been put in place, with their financial advisors, and counsel, etcetera. The debtor in possession itself had a change of counsel, about six weeks into the case as I recall. Realistically the debtor is only now in a position it would have been in the first weeks of a normal case. Therefore, I conclude that the debtor should have 120 days period from now to get—in practical terms and in the spirit of the statute—the benefit of the statutory exclusive period.

What of any extension beyond that period? I probably would go with either the creditors' committee's six month extension, or maybe even the debtor's and U.S. Trustee's recommendation of the eight month period, if I could be satisfied and feel assured that there are no obstacles to free access to the necessary data by qualified negotiating parties. And in terms of such an extension, contrary to some of the positions that have been argued, I believe there is a reasonable chance to resolve many of the uncertainties in this case by negotiation, with sufficient time given for that purpose. In other words, I don't buy completely the argument that because there are many uncertainties and it may be just as uncertain in January of next year or November ... of this year, that that by itself is a reason to throw up our hands on the negotiating process and require a quick plan.

But I do have some concern about I guess what has occupied me from the first time I heard the case, and that is this simply is not a normal case for many reasons. I won't bore you with the recitation of them. We've gone over them in many hearings. And when I hear arguments in this case I'm often reminded of that fact because they ring a little offkey in terms of what seem to me realities of this case. And one of those realities is that you have a regulated utility with some circular legal questions as to rate-setting, etcetera. And the other is complexity in terms of just the nature of the company and projections when your projections have to take in account future income, which is controllable, arguably, by regulatory authority as well as a debtor in a reorganization plan.

Those complexities seem to me to require some sort of data bank accessible to all qualified parties in the negotiating process. Otherwise the negotiating process is simply some words that may not have reality with regard to this case. I don't question the good faith of anybody that's in this courtroom. But I do have some reservations as to whether just giving an extensive extension here without some kind of structure for that process is appropriate.

In the same manner, I will reemphasize what I said during the course of the hearing and that is this court at least is not at all interested in getting into the nitty gritty of the plan formulation. I recognize that short extensions turn into status conference hearings and progress hearings at which attorneys or parties can seek to use that hearing as, in effect, a plan formulation hearing. And perhaps some bankruptcy judges intrude into that process more than I myself think is appropriate. That is not what I'm about here.

What I am about is creating an objective procedure that gives free access to those parties that need it to expedite the negotiation of the plan. And that procedure I do not think can be defined in terms of any case we've ever seen before. It has to react to the uniqueness of this case.

\*    \*    \*    \*    \*    \*

The other uncertainty I have in this case is that I'm still not convinced that at an appropriate stage in this case opening up the process to competing plans is not going to be the way to go. I tend to agree with the debtor and the committees that this is not the point at which to do that. At what point to reach that I do not express any

opinion. But, as I indicated in one of the questions I presented to the parties, I still have some unresolved views in my own mind about that—it doesn't seem to me beyond the pale of proper construction of chapter 11 of the Code to perhaps justify delay in submission of multiple plans until adequate time to work out a consensual plan is given. I don't think that that necessarily would be an improper interpretation of the Bankruptcy Code, as long as the bankruptcy judge does not intrude himself into the plan formulation details or selection process. And I need to think about that before I enter any kind of opinion or order that might take a position on that—terminate the exclusivity period and then seek to control multiple plans by some perhaps unprecedented procedural steps but perhaps justifiable ones in a case of this nature.

\*    \*    \*    \*    \*    \*

### SUPPLEMENTAL ORDER ON PLAN EXCLUSIVITY EXTENSION

This case was commenced by a voluntary chapter 11 petition filed by the debtor on January 28, 1988. On April 28, 1988 the debtor filed its Motion To Extend Plan Exclusivity Period seeking to extend the 120–day and 180–day exclusivity periods prescribed by § 1121 of the Bankruptcy Code from their present expirations on May 27, 1988 and July 26, 1988 to January 27, 1989.

Following requisite notice an all-day hearing on the motion was held before the court on May 19, 1988, to determine whether the debtor could show "cause" for an extension of the statutorily-prescribed exclusivity period pursuant to § 1121(d) of the Code.

On May 26, 1988, in view of the imminent expiration of the exclusivity period, the court entered a "Preliminary Order Re Plan Exclusivity Extension" finding and concluding that the debtor had shown cause for at least a 120–day extension. (Court Document # 775) In that Order the court reserved jurisdiction to consider such further extension of the exclusivity period as might be justified by a more complete review of the record.

The court has now completed its review of the entire record pertaining to this matter and has set forth its findings and conclusions in its separate Memorandum Opinion entered this date, which findings and conclusions are hereby incorporated by reference. Accordingly, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

1. The exclusive period within which the debtor alone may file a plan of reorganization in this case pursuant to § 1121(b) and § 1121(d) of the Bankruptcy Code is hereby extended to December 27, 1988, the debtor having shown the requisite cause for such extension within the meaning and purpose of the statute.

2. If the debtor files a plan on or before December 27, 1988, the further exclusivity period to secure acceptance of the plan pursuant to § 1121(c)(3) and § 1121(d) of the Bankruptcy Code is hereby extended to February 28, 1989.