In re AMKO PLASTICS, INC., Debtor.

Bankruptcy No. 95–14620.

United States Bankruptcy Court, S.D. Ohio, Western Division.

April 10, 1996.

Kevin E. Irwin, Cincinnati, OH, for debtor.

Stephen D. Lerner, Cincinnati, OH, for Star Bank.

Robert L. Morrison, Craig A. Barbarose, Costa Mesa, CA, for Newcastle.

David F. Heroy, Chicago, IL, for the UCC.

Mark A. Greenberger, Cincinnati, OH, Local Counsel for the UCC.

## DECISION RE EXCLUSIVITY EXTENSION

BURTON PERLMAN, Bankruptcy Judge.

This Chapter 11 debtor filed its bankruptcy case November 7, 1995. The exclusivity period provided by statute, that period during which only debtor may file a plan, expired March 7, 1996, and the associated period to gain acceptance of the plan will expire May 7, 1996. Debtor timely moved to extend the exclusivity periods until August 7, 1996 and October 7, 1996, respectively. An objection to extension of exclusivity with memorandum was filed by the Unsecured Creditors' Committee ("UCC"). Newcastle Group, Inc., ("Newcastle"), an unsecured creditor of the debtor, filed a memorandum in opposition to the motion, in support thereof filing a declaration of David Nash, the Chief Executive Officer of Newcastle.

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A).

The Bankruptcy Code at 11 U.S.C. § 1121 grants a debtor an exclusive period of 120 days after the date of the order for relief to file a plan, and further provides at § 1121(d) that "the court may for cause" increase the initial exclusivity period. The issue before the court on the present motion is whether debtor can show sufficient cause to justify the extension of the exclusivity period which it has requested. The matter came on for evidentiary hearing.

At the hearing, debtor made its case in support of an extension by the testimony of Frank R. Budetti. Budetti is a turn-around expert whose services were retained by debtor in October, 1995, just before the bankruptcy filing in this case. He and his firm were

retained to review the company, to develop a turn-around plan, and then to implement that plan. He testified that debtor is in the flexible plastic packaging manufacturing business, and that the reason that debtor found itself in financial straits was that two and a half years ago debtor concluded that it was necessary to change the nature of its products. Debtor embarked on a program to do so, and made large capital expenditures for new equipment. Substantial debt in connection with that acquisition was incurred. It was expected that 1995 would be a good year for debtor's business, and that would enable debtor to handle its debt without difficulty. Instead, 1995 was a very bad year, and debtor was unable to manage its highly leveraged debt position.

Since assuming responsibility for the business affairs of the debtor, Budetti has taken steps to stabilize the business. The work force has been reduced almost by half. An affirmative effort in the turn-around has been to reduce total sales by eliminating unprofitable segments of debtor's business. A cash collateral order has been negotiated with debtor's lender which extends for a year. A new accounting system, and a new scheduling system, have been installed. Attention has been directed to the new product lines envisioned by the debtor, and new equipment has been installed for this purpose. Efforts are underway to hire new personnel, particularly qualified sales personnel for the merchandising of the new product lines. Debtor has vacated two warehouses that it had been using, resulting in a saving in rent of $28,000.00 a month. Budetti testified that for the first couple of months of his entry on debtor's scene, he was bound by debtor's prior practices, and it is only since that time, that is, since early 1996, that turn-around efforts began, and the impact of those efforts is just beginning to take effect. Several months are now needed to see the results of those steps and to evaluate them. It was Budetti's testimony that debtor's is a seasonal business, with the early part of any year being least profitable, while the latter part of the year is more profitable. In addition to the operational steps undertaken in connection with the turn-around, Budetti and the president of debtor have explored possibilities of securing an infusion of capital into the business, both by third-party investors as well as by additional investment by present equity holders.

On cross-examination, counsel for the Unsecured Creditors' Committee developed that debtor had had losses amounting to some $3 million for 1995, and there had been significant loss in the business since the case was filed and turn-around efforts commenced.

This court finds as a fact from the foregoing testimony that debtor has initiated and implemented substantial and significant turn-around efforts which are now in progress. The reorientation of debtor's business which was deemed to be necessary by the debtor is being pursued aggressively, while the work force of debtor which is carrying out that effort has been reorganized for greater efficiency and accountability. The turn-around plan, however, has not yet been completed nor carried forward to the point that its effectiveness can be finally evaluated.

As we have stated, § 1121(d) provides that our present decision must turn on the question of whether the foregoing facts constitute the "cause" required by the statute. Debtor argues that a major test applied by the courts in determining whether or not there is cause, depends upon a holding that the case is large and complex. It is true that this factor is often discussed in the cases. *See e.g., In re Grand Traverse Development Co., Ltd. Partnership,* 147 B.R. 418 (Bankr. W.D.Mich.1992); *In re Public Service Co. of New Hampshire,* 88 B.R. 521 (Bankr.D.N.H. 1988). Debtor argues that this is a large and complex case and therefore meets this test. The UCC, to the contrary, argues that this is not a large enterprise because it only has one facility, one bank, and less than $6 million of unsecured trade debt. It does not involve complex issues such as mass torts, large judgments, or environmental claims. We are of the opinion, however, that the debate by the parties regarding size and complexity is beside the point and does not fairly deal with the thrust of the evidence. Different considerations should be applied in this case.

Case law already contains extensive discussions of the legislative history leading to the enactment of § 1121, *see In re Timbers of Inwood Forest Assoc.*, 808 F.2d 363, 372 (5th Cir.1987); *In re Public Service Co. Of New Hampshire*, 88 B.R. 521, 534–537 (Bankr.D.N.H.1988); *In the Matter of All Seasons Industries*, 121 B.R. 1002, 1004 (Bankr.N.D.Ind.1990), and we will not restate what other courts have presented so well. We will observe that that history amply supports the following statement:

> As has already been indicated, § 1121(d) provides a "for cause" standard in determining exclusivity extension requests. As might be inferred from such a general standard, the legislative intent has been construed to leave the question to the reorganization court in the exercise of its discretion and to promote maximum flexibility to suit various types of reorganization proceedings.

*In re Public Service Co. of New Hampshire*, 88 B.R. at 534. Another statement, also well supported in legislative history and the case law is:

> Section 1121(d) requires an affirmative showing of "cause" for extension or reduction of the exclusivity periods. Congress intended to create a balance so as to protect the right of a debtor in possession to propose and obtain the requisite consents to its plan of reorganization while at the same time protecting creditors from abuse of chapter 11 by a debtor unwilling to negotiate in good faith with creditors.

5 Collier on Bankruptcy (15th ed.) ¶ 1121.04 at p. 1121–16.

■ The situation delineated by the evidence in the case before us shows that debtor has instituted an extensive turn-around program. There has been no objection by creditors to putting such a program into place and implementing it. The evidence shows that the pace of the turn-around effort has been reasonably rapid, and satisfies this court that the efforts display reasonable business judgment, and offer a reasonable possibility of success. It is clear that it is too early to make a judgment about what the outcome of the turn-around efforts will be, and from this it follows that the debtor presently simply is in no position to propose a plan to its creditors, and will not be in a position to do so until the results of the turn-around manifest themselves. The evidence presented to the court is that this will occur during the extension of the exclusivity period which is here sought.

Therefore, applying the "flexibility" in dealing with the question of extension of exclusivity which the cases suggest, and considering the nature of the business of this debtor, and the progress which has been made, we hold that debtor has shown cause for the extension which it seeks. Particularly is this so where the extension is necessary in order that debtor be protected in its "right ... to propose ... its plan of reorganization." There is no prejudice to creditors if the presently-sought extension is granted. There is no indication whatever that this debtor is "unwilling to negotiate in good faith with creditors," and in this area of the law, prejudice refers to a debtor which has displayed such conduct. *In the Matter of Lake in the Woods*, 10 B.R. 338, 345 (E.D.Mich. 1981); *In re Parker Street Florist & Garden Center*, 31 B.R. 206, 207 (Bankr.D.Mass. 1983); *In re Southwest Oil*, 84 B.R. 448, 453 (Bankr.W.D.Tex.1987). The record before us contains no evidence which would support a conclusion that this is a reason for the seeking of the extension by debtor. Debtor is simply as yet unable to negotiate realistically with creditors.

■ The UCC has argued in opposition to the motion that debtor's efforts to reorganize thus far have produced only losses. Further, it asserts that termination of exclusivity may assist the achievement of a consensual plan. We hold that these arguments provide no basis for denying the motion. Debtor's turn-around expert has adequately explained that the losses to which the UCC refers are not inconsistent with ultimately successful turn-around efforts. Further, as we stated in *In re Eagle–Picher Industries, Inc.*, 176 B.R. 143, 147–48 (Bankr.S.D.Ohio 1994), there is no reason to believe that termination of exclusivity will expedite the plan process.

The UCC has not offered a plan in connection with its opposition to the present motion,

nor shared with the court what initiatives it would undertake if exclusivity were terminated. It would seem that the only other course than the one being pursued by the debtor would be liquidation, either in Chapter 11 or Chapter 7. If that is the course contemplated by the UCC, it seems to the court that a showing ought to be made of the presence of one or another of the bases for conversion or dismissal contemplated at § 1112(b)(1) through (4). On the record before us, none of these conditions, absence of a reasonable likelihood of rehabilitation, inability to effectuate a plan, unreasonable delay by the debtor, or failure to timely propose a plan, are here present.

■ In addition to the opposition to the debtor's motion of the UCC, Newcastle filed a memorandum in opposition to the motion, and participated in the hearing. The record at the hearing established that Newcastle became a creditor of the debtor by purchasing the claim of a direct creditor. Generally, the opposition to extension of exclusivity by Newcastle tracks that of the UCC. Something not to be found in the UCC objection, however, is the invocation by Newcastle of principles of corporate law as a basis for denying exclusivity.

That is, Newcastle contends that those in control of this debtor have a fiduciary duty to obtain the highest value for shareholders and creditors. Newcastle contends that an extension of the exclusivity period is inconsistent with that duty. This can only be understood in the context of the Nash declaration which accompanies the memorandum in opposition to the motion filed by Newcastle. That declaration makes it clear that Newcastle desires to acquire the debtor, and that Newcastle is asserting that only this course ·is consistent with responsible fiduciary conduct. This position is at best merely a self-serving statement. Clearly, Newcastle believes that termination of exclusivity will assist its acquisition of debtor, and this will serve the interests of Newcastle, but its argument is entirely unpersuasive that termination of exclusivity will benefit all creditors.

In view of the foregoing discussion, debtor's motion to extend its exclusive right to file a plan of reorganization until August 7, 1996, and its right to gain its acceptance until October 7, 1996, will be granted. In addition, the court will sua sponte grant an extension of debtor's time to file a plan as ordered in entry of November 15, 1995, until August 7, 1996.